GEORGIA ᴇᴛ ᴀʟ. *v.* UNITED STATES

No. 72–75.   Argued February 21–22, 1973—Decided May 7, 1973

STEWART, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, MARSHALL, and BLACKMUN, JJ., joined. BURGER, C. J., filed an opinion concurring in the result, *post*, p. 541. WHITE, J., filed a dissenting opinion in which POWELL and REHNQUIST, JJ., joined, *post*, p. 542. POWELL, J., filed a dissenting opinion, *post*, p. 545.

*Harold N. Hill, Jr.*, Executive Assistant Attorney General of Georgia, argued the cause for appellants. With him on the briefs were *Arthur K. Bolton*, Attorney General, and *Robert J. Castellani* and *Dorothy Y. Kirkley*, Assistant Attorney General.

*Deputy Solicitor General Wallace* argued the cause for the United States. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Norman, James P. Turner, William Bradford Reynolds*, and *John C. Hoyle.**

MR. JUSTICE STEWART delivered the opinion of the Court.

The Attorney General of the United States brought this suit under § 12 (d) of the Voting Rights Act of 1965 as amended, 42 U. S. C. § 1973j (d), to enjoin the State of Georgia from conducting elections for its House of Representatives under the 1972 legislative reapportionment law. A three-judge District Court in the Northern District of Georgia agreed that certain aspects of the reapportionment law came within the ambit of § 5 of the Act, 42 U. S. C. § 1973c, and that the State, which is sub-

---

*\*Stephen J. Pollak, Richard M. Sharp*, and *Armand Derfner* filed a brief for the National Association for the Advancement of Colored People et al. as *amici curiae* urging affirmance.

ject to the provisions of § 5,[1] had not obtained prior clearance from either the Attorney General or the District Court for the District of Columbia. Accordingly, and without reaching the question whether the reapportionment plan had the purpose or effect of "denying or abridging the right to vote on account of race or color," 42 U. S. C. § 1973c, the District Court issued the requested injunction.[2] The State brought this appeal. We noted probable jurisdiction, staying enforcement of the District Court judgment pending disposition of the appeal. 409 U. S. 911.

Following the 1970 Census, the Georgia Legislature set out to reapportion its State House of Representatives, State Senate, and federal congressional electoral districts. We are here concerned only with the reapportionment plan for the State House of Representatives.[3] The result of the legislature's deliberations was a plan (hereinafter the 1971 plan) that, as compared with the prior 1968 scheme, decreased the number of districts from 118 to 105, and increased the number of multimember districts from 47 to 49. Whereas the prior apportionment plan had generally preserved county lines, the 1971 plan did not: 31 of the 49 multimember districts and 21 of the 56 single-member districts irregularly crossed county boundaries. The boundaries of nearly all districts were changed, and in many instances the number of represent-

---

[1] A State is subject to § 5 if it qualifies under § 4 (b), 42 U. S. C. § 1973b (b). Covered States are those which on November 1, 1964, employed any of several enumerated tests or devices as a prerequisite to voting, and in which less than 50% of eligible voters were registered to vote or actually voted in the November 1964 presidential election. States that meet identical criteria with respect to the 1968 presidential election are also covered under the amended Act. It is stipulated that Georgia is covered under § 4 (b).

[2] 351 F. Supp. 444, 446–447.

[3] No objection was interposed with respect to the State Senate or federal congressional districts.

atives per district was altered. Residents of some 31 counties formerly in single-member districts were brought into multimember districts. Under continuing Georgia law, a candidate receiving less than a majority of the votes cast for a position was required to participate in a majority runoff election. Ga. Code Ann. § 34–1513. And in the multimember districts, each candidate was required to designate the seat for which he was running, referred to as the "numbered post." Ga. Code Ann. § 34–1015.

Section 5 of the Voting Rights Act forbids States subject to the Act from implementing any change in a "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" without first obtaining a declaratory judgment from the District Court for the District of Columbia that the proposed change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color," *or* submitting the plan to the Attorney General of the United States and receiving no objection within 60 days. 42 U. S. C. § 1973c. Pursuant to this requirement, the State of Georgia submitted the 1971 plan to the Attorney General on November 5, 1971. Two weeks later, a representative of the Department of Justice wrote to the State Attorney General, requesting further information needed to assess the racial impact of the tendered plan.[4] This information was received on January 6, 1972, and on March 3, 1972, the Attorney General of the United States formally objected to the State's plan. The objection letter cited the combination

---

[4] The Justice Department asked for census maps of the 1964 and 1968 House districts; the distribution of white and nonwhite population within the 1964, 1968, and 1971 districts; a history of the primary and general elections in which Negro candidates ran; data, including race, with respect to all elected state representatives; and the legislative history of all redistricting bills.

of multimember districts, numbered posts, majority run-off elections, and the extensive departure from the State's prior policy of adhering to county lines. On the basis of these changes, plus particular changes in the structure of potential black majority single-member districts, the Attorney General was "unable to conclude that the plan does not have a discriminatory racial effect on voting." The letter stated that the Attorney General therefore felt obligated to "interpose an objection to changes submitted by these reapportionment plans."

The State Legislature immediately enacted a new reapportionment plan and repealed its predecessor. The 1972 plan increased the number of districts from 105 to 128, and decreased the number of multimember districts from 49 to 32. Twenty-two of the multimember districts and 37 of the single-member districts still crossed county boundaries.

This 1972 plan was submitted to the Attorney General on March 15, and he objected on March 24. The Assistant Attorney General's letter stated, in part:

> "After a careful analysis of the Act redistricting the Georgia House of Representatives, I must conclude that this reapportionment does not satisfactorily remove the features found objectionable in your prior submission, namely, the combination of multi-member districts, numbered posts, and a majority (runoff) requirement discussed in my March 3, 1972, letter to you interposing an objection to your earlier Section 5 submission. Accordingly, and for the reasons enunciated in my March 3, 1972, letter I must, on behalf of the Attorney General, object to S. B. 690 reapportioning the Georgia House of Representatives."

When the Georgia Legislature resolved that it would take no further steps to enact a new plan, the Attorney General brought the present lawsuit.

The State of Georgia claims that § 5 is inapplicable to the 1972 House plan, both because the Act does not reach "reapportionment" and because the 1972 plan does not constitute a change from procedures "in force or effect on November 1, 1964." If applicable, the Act is claimed to be unconstitutional as applied. The State also challenges two aspects of the Attorney General's conduct of the § 5 objection procedure, claiming, first, that the Attorney General cannot object to a state plan without finding that it in fact has a discriminatory purpose or effect, and, second, that the Attorney General's objection to the 1971 plan was not made within the 60-day time period allowed for objection under the Act.

I

Despite the fact that multimember districts, numbered posts, and a majority runoff requirement were features of Georgia election law prior to November 1, 1964, the changes that followed from the 1972 reapportionment are plainly sufficient to invoke § 5 if that section of the Act reaches the substance of those changes. Section 5 is not concerned with a simple inventory of voting procedures, but rather with the reality of changed practices as they affect Negro voters. It seems clear that the extensive reorganization of voting districts and the creation of multimember districts in place of single-member districts in certain areas amounted to substantial departures from the electoral state of things under previous law. The real question is whether the substance of these changes undertaken as part of the state reapportionment are "standards, practices, or procedures with respect to voting" within the meaning of § 5.

The prior decisions of this Court compel the conclusion that changes of the sort included in Georgia's 1972 House reapportionment plan are cognizable under § 5. In *South Carolina* v. *Katzenbach,* 383 U. S. 301, we upheld the

basic constitutionality of the Voting Rights Act. Mr. Justice Black dissented from that judgment to the extent that it held every part of § 5 is constitutional, precisely describing the broad sweep of § 5:

> "Section 5 goes on to provide that a State covered by § 4 (b) can in no way amend its constitution or laws relating to voting without first trying to persuade the Attorney General of the United States or the Federal District Court for the District of Columbia that the new proposed laws do not have the purpose and will not have the effect of denying the right to vote to citizens on account of their race or color." 383 U. S., at 356 (concurring and dissenting opinion).

The applicability of § 5 to election law changes such as those enacted by Georgia in its 1972 plan was all but conclusively established by the opinion of this Court in *Allen* v. *State Board of Elections,* 393 U. S. 544. The *Allen* opinion, dealing with four companion cases, held that § 5 applied to a broad range of voting law changes, and was constitutional as applied. With respect to the reach of § 5, we held that "[t]he legislative history on the whole supports the view that Congress intended to reach any state enactment which altered the election law of a covered State in even a minor way." *Id.,* at 566. One of the companion cases, *Fairley* v. *Patterson,* involved a claim that a change from district to at-large voting for county supervisor was a change in a "standard, practice, or procedure with respect to voting." The challenged procedure was held to be covered by § 5. We noted that "[t]he right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot. See *Reynolds* v. *Sims,* 377 U. S. 533, 555 (1964)." *Id.,* at 569. In holding that § 5 reached voting law changes that threatened to dilute

Negro voting power, and in citing *Reynolds* v. *Sims*, we implicitly recognized the applicability of § 5 to similar but more sweeping election law changes arising from the reapportionment of state legislatures. 393 U. S., at 565–566, 583–586 (Harlan, J., concurring and dissenting).

Had Congress disagreed with the interpretation of § 5 in *Allen,* it had ample opportunity to amend the statute. After extensive deliberations in 1970 on bills to extend the Voting Rights Act, during which the *Allen* case was repeatedly discussed,[5] the Act was extended for five years, without any substantive modification of § 5. Pub. L. 91–285, 84 Stat. 314, 315. We can only conclude, then, that *Allen* correctly interpreted the congressional design when it held that "the Act gives a broad interpretation to the right to vote, recognizing that voting includes 'all action necessary to make a vote effective.' " 393 U. S., at 565–566.

Another measure of the decisiveness with which *Allen* controls the present case is the actual practice of covered States since the *Allen* case was decided. Georgia, for example, submitted its 1971 plan to the Attorney General because it clearly believed that plan was covered by § 5. Its submission was "made pursuant to § 5," and the State Attorney General explained in his submission that the 1968 reapportionment of the Georgia House of Repre-

---

[5] See, *e. g.*, Hearings before Subcommittee No. 5 of the House Committee on the Judiciary on H. R. 4249, H. R. 5538, and Similar Proposals, 91st Cong., 1st Sess., 1, 4, 18, 83, 130–131, 133, 147–149, 154–155, 182–184, 402–454; Hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary on Bills to Amend the Voting Rights Act of 1965, 91st Cong., 1st and 2d Sess., 48, 195–196, 369–370, 397–398, 426–427, 469. David ·L. Norman, then Deputy Assistant Attorney General, Civil Rights Division, testified that, "from court decisions, all these redistricting plans are going to have to be submitted to the Attorney General for his approval because they are voting changes." Senate Hearings, *supra,* at 507.

sentatives "was not submitted because at that time, prior to *Allen* v. *Board of Elections, . . .* it was believed to be unnecessary to submit reapportionment plans to the United States Attorney General pursuant to the Voting Rights Act of 1965." When the Attorney General objected, Georgia changed its House plan and resubmitted it pursuant to § 5. Other States covered by the Act have also read *Allen* as controlling. The brief for the United States advises us that as of December 1, 1972, 381 post-*Allen* reapportionment plans had been presented to the Attorney General by various States for § 5 approval.

In the present posture of this case, the question is not whether the redistricting of the Georgia House, including extensive shifts from single-member to multimember districts, in fact had a racially discriminatory purpose or effect. The question, rather, is whether such changes have the potential for diluting the value of the Negro vote and are within the definitional terms of § 5. It is beyond doubt that such a potential exists, cf. *Whitcomb* v. *Chavis,* 403 U. S. 124, 141–144. In view of the teaching of *Allen,*[6] reaffirmed in *Perkins* v. *Matthews,* 400 U. S.

---

[6] The appellants point to language in the *Allen* opinion that, they say, left open the question of the applicability of § 5 to a state reapportionment law. The cited passage in *Allen* is as follows:

"Appellees in No. 25 [*Fairley* v. *Patterson*] also argue that § 5 was not intended to apply to a change from district to at-large voting, because application of § 5 would cause a conflict in the administration of reapportionment legislation. They contend that under such a broad reading of § 5, enforcement of a reapportionment plan could be enjoined for failure to meet the § 5 approval requirements, even though the plan had been approved by a federal court. Appellees urge that Congress could not have intended to force the States to submit a reapportionment plan to two different courts.

"We must reject a narrow construction that appellees would give to § 5. . . .

. . . . .

". . . The argument that some administrative problem might

379, we hold that the District Court was correct in deciding that the changes enacted in the 1972 reapportionment plan for the Georgia House of Representatives were within the ambit of § 5 of the Voting Rights Act.[7]   And for the reasons stated at length in *South Carolina* v. *Katzenbach,* 383 U. S., at 308–337, we reaffirm that the Act is a permissible exercise of congressional power under § 2 of the Fifteenth Amendment.

---

arise in the future does not establish that Congress intended that § 5 have a narrow scope; we leave to another case a consideration of any possible conflict." 393 U. S. 544, 564–565, 569.

The caveat implicit in this language would support the appellants' position only if practical problems of administration had emerged in the period that has elapsed since *Allen* was decided. This does not appear to have been the case. The brief of the United States advises us that the Department of Justice has adopted procedures designed to minimize any conflicts between § 5 administrative review and federal court litigation based on Fourteenth or Fifteenth Amendment attacks upon state reapportionment plans. Where a reapportionment plan has been prescribed by federal judicial decree, the Attorney General does not review it. See *Connor* v. *Johnson,* 402 U. S. 690, 691. Where a plan has been submitted to the Attorney General and is at the same time being litigated with respect to a Fifteenth Amendment claim, the Attorney General has deferred to the judicial determination regarding racial discrimination. Finally, the number of instances presenting an administrative-judicial overlap has been small. Of the 381 reapportionments submitted to the Attorney General, only 19 of the objected-to submissions were involved in litigation when submitted.

[7] Georgia has argued that § 5 approval is needed only with respect to those electoral districts in which a change in a "standard, practice, or procedure with respect to voting" occurred. In an appropriate case, a State might establish that a reapportionment plan left some districts unaffected by even a minor change with the potential for diluting the value of the Negro vote. We do not decide whether Georgia could show the existence of any unaffected districts in this case, and we leave that issue for consideration by the District Court on remand.

## II

By way of implementing the performance of his obligation to pass on state submissions under § 5, the Attorney General has promulgated and published in the Federal Register certain administrative regulations, 28 CFR Part 51. The appellants claim these regulations are without legislative authorization, and object in particular to the application in the present case of two regulations which set forth the standards for decision on submissions and more fully define the 60-day time period provided in the Act.

It is true, as the appellants contend, that § 5 itself does not authorize the Attorney General to promulgate any regulations. But § 5 is also silent as to the procedures the Attorney General is to employ in deciding whether or not to object to state submissions, as to the standards governing the contents of those submissions, and as to the meaning of the 60-day time period in which the Attorney General is to object, if at all. Rather than reading the statute to grant him unfettered discretion as to procedures, standards, and administration in this sensitive area, the Attorney General has chosen instead to formulate and publish objective ground rules. If these regulations are reasonable and do not conflict with the Voting Rights Act itself, then 5 U. S. C. § 301, which gives to "[t]he head of an Executive department" the power to "prescribe regulations for the government of his department, . . . [and] the distribution and performance of its business . . . ," is surely ample legislative authority for the regulations. See *United States* v. *Morehead*, 243 U. S. 607; *Smith* v. *United States*, 170 U. S. 372.

In 28 CFR § 51.19, the Attorney General has set forth the standards to be employed in deciding whether or not to object to a state submission. The regulation states that the burden of proof is on the submitting party, and

that the Attorney General will refrain from objecting only if his review of the material submitted satisfies him that the proposed change does not have a racially discriminatory purpose or effect. If he is persuaded to the contrary, or if he cannot within the 60-day time period satisfy himself that the change is without a discriminatory purpose or effect, the regulation states that the Attorney General will object to the submission.[8] In objecting to the 1971 plan, the Assistant Attorney General wrote that he was "unable to conclude that the plan does not have a discriminatory racial effect on voting." The objection letter to the 1972 plan did not specify a degree of certainty as to the plan's discriminatory impact, but instead stated that the new plan had not remedied the features found objectionable in its predecessor.

Although both objections were consistent with the Attorney General's regulations, the appellants in effect attack the legitimacy of the regulation described above in contending that the Attorney General is without power to object unless he has actually found that the changes contained in a submission have a discriminatory purpose or effect.

---

[8] Title 28 CFR § 51.19, in pertinent part, states that: "the burden of proof on the submitting authority is the same in submitting changes to the Attorney General as it would be in submitting changes to the District Court for the District of Columbia. . . . If the Attorney General is satisfied that the submitted change does not have a racially discriminatory purpose or effect, he will not object to the change and will so notify the submitting authority. If the Attorney General determines that the submitted change has a racially discriminatory purpose or effect, he will enter an objection and will so notify the submitting authority. If the evidence as to the purpose or effect of the change is conflicting, and the Attorney General is unable to resolve the conflict within the 60-day period, he shall, consistent with the above-described burden of proof applicable in the District Court, enter an objection and so notify the submitting authority."

In assessing this claim, it is important to focus on the entire scheme of § 5. That portion of the Voting Rights Act essentially freezes the election laws of the covered States unless a declaratory judgment is obtained in the District Court for the District of Columbia holding that a proposed change is without discriminatory purpose or effect. The alternative procedure of submission to the Attorney General "merely gives the covered State a rapid method of rendering a new state election law enforceable." *Allen* v. *State Board of Elections*, 393 U. S., at 549.

It is well established that in a declaratory judgment action under § 5, the plaintiff State has the burden of proof.[9] What the Attorney General's regulations do is to place the same burden on the submitting party in a § 5 objection procedure. Though the choice of language in the objection letter sent to the State of Georgia was not a model of precision, in the context of the promulgated regulations the letter surely notified the State with sufficient clarity that it had not sustained its burden of proving that the proposed changes were free of a racially discriminatory effect. It is not necessary to hold that this allocation of the burden of proof by the Attorney General was his only possible choice under the Act, in order to find it a reasonable means of administering his § 5 obligation. Any less stringent standard might well have rendered the formal declaratory judgment procedure a dead letter by making available to covered States a far smoother path to clearance. The Attorney General's choice of a proof standard was thus at least reasonable

---

[9] The very effect of § 5 was to shift the burden of proof with respect 'to racial discrimination in voting. Rather than requiring affected parties to bring suit to challenge every changed voting practice, States subject to § 5 were required to obtain prior clearance before proposed changes could be put into effect. The burden of proof is on "the areas seeking relief." *South Carolina* v. *Katzenbach*, 383 U. S. 301, 335.

and consistent with the Act, and we hold that his objection pursuant to that standard was lawful and effective.

The appellant's final contention is that the Attorney General's objection to the 1971 plan was untimely, and so the submitted plan should have been held by the District Court to have gone into effect. It is far from clear that this claim is not simply moot, since the state enactment establishing the 1972 plan explicitly repealed the 1971 plan,[10] and the objection to the 1972 plan was clearly within the statutory time period. In any event, the claim is without merit.

In promulgating regulations, the Attorney General dealt with several aspects of the 60-day time limit established by § 5 of the Act. The regulations provide that all calendar days count as part of the allotted period, that parties whose submissions are objected to may seek reconsideration on the basis of new information and obtain a ruling within 60 days of that request, and that the 60-day period shall commence from the time the Department of Justice receives a submission satisfying the enumerated requirements. 28 CFR § 51.3 (b)–(d).

In the present case, the Attorney General found the initial submission of the 1971 plan incomplete under the regulations. Two weeks after receiving it, he requested additional information.[11] His letter referred to 28 CFR

---

[10] See Ga. Senate Bill 690, Mar. 9, 1972.

[11] The letter sent to the Attorney General of Georgia stated that a "preliminary examination" of the materials submitted led the Department of Justice to conclude "that the data sent to the Attorney General are insufficient to evaluate properly the changes you have submitted. In accordance with Sections 51.10 (a) (6) and 51.18 (a) of the Procedures for the Administration of Section 5 of the Voting Rights Act of 1965 . . . would you· please assist us by providing this Department the following additional information: . . . ."

The promulgated regulations define in 28 CFR § 51.10 the contents of a submission. Section 51.10 (a) (6) states:

"With respect to redistricting, annexation, and other complex

§ 51.18, a regulation providing for a request for additional information, and noted the additional regulatory provision that the 60-day period would not commence until the information was received. The State did not submit the requested data until January 6, 1972. Under the above-mentioned regulation the 60-day period commenced on that date, and the Department of Justice made its objection within 60 days—on March 3.

The appellants argue that the Attorney General has granted himself more time than the statute provides by promulgating regulations suspending the time period until a complete submission is received. Here again, the question is whether the regulation is a reasonable administrative effectuation of § 5 of the Act. The judgment that the Attorney General must make is a difficult and complex one, and no one would argue that it should be made without adequate information. There is no serious claim in this case that the additional information requested was unnecessary or irrelevant to § 5 evaluation of the submitted reapportionment plan.[12] Yet, if the Attorney General were denied the power to suspend the 60-day period until a complete submission were tendered, his only plausible response to an inadequate or incomplete submission would be simply to object to it. He would then leave it to the State to submit adequate

changes, other information which the Attorney General determines is required to enable him to evaluate the purpose or effect of the change. Such other information may include items listed under paragraph (b) of this section. When such other information is required, the Attorney General shall notify the submitting authority in the manner provided in § 51.18 (a)."

Section 51.10 (b) "strongly urges" submitting authorities to produce the information enumerated to the extent it is available and relevant to the submitted changes. Virtually all of the information requested in this case, see n. 4, *supra,* falls within the enumerated categories of § 51.10 (b).

[12] See n. 4, *supra.*

information if it wished to take advantage of this means of clearance under § 5. This result would only add acrimony to the administration of § 5. We conclude, therefore, that this facet of the Attorney General's regulations is wholly reasonable and consistent with the Act.[13]

## III

For the foregoing reasons, the judgment of the District Court is affirmed. Since, however, elections were conducted under the disputed 1972 plan by reason of this Court's stay order, it would be inequitable to require new elections at this time.

The case is remanded to the District Court with instructions that any future elections under the Georgia House reapportionment plan be enjoined unless and until the State, pursuant to § 5 of the Voting Rights Act, tenders to the Attorney General a plan to which he does not object, or obtains a favorable declaratory judgment from the District Court for the District of Columbia.

*It is so ordered.*

Mr. Chief Justice Burger, concurring in the result.

I concur in the result reached by the Court but I do so under the mandate of *Allen* v. *State Board of Elections,*

---

[13] The appellants contend that to allow the Attorney General to promulgate this regulation is to open the way to frivolous and repeated delays by the Justice Department of laws of vital concern to the covered States. No such conduct by the Attorney General is presented here, and by upholding the basic validity of the regulation we most assuredly do not prejudge any case in which such unwarranted administrative conduct may be shown. Furthermore, a submission to the Attorney General is not the exclusive mode of preclearance under § 5. If a State finds the Attorney General's delays unreasonable, or if he objects to the submission, the State "may still enforce the legislation upon securing a declaratory judgment in the District Court for the District of Columbia." *Allen* v. *State Board of Elections,* 393 U. S., at 549.

393 U. S. 544 (1969). I have previously expressed my reservations as to the correctness of that holding. See *Perkins* v. *Matthews,* 400 U. S. 379, 397 (1971) (BLACK-MUN, J., concurring in judgment).

MR. JUSTICE WHITE, with whom MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST join, dissenting.

Section 5 of the Voting Rights Act of 1965 provides that a covered State may not put into effect any change in voting qualifications or voting standards, practices, or procedures until it either procures a declaratory judgment from the United States District Court for the District of Columbia to the effect that the alteration does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or submits the alteration to the Attorney General and an objection has not been interposed by that official during the ensuing 60 days. In this case, the Attorney General interposed an objection on March 24, 1972, to the March 9 reapportionment plan of the Georgia House of Representatives and shortly thereafter sued to enjoin the use of that plan on the ground that the State had obtained neither the approval of the Attorney General nor a declaratory judgment. The District Court held § 5 was applicable to changes in state apportionment plans and that the section prevented the March 9 reapportionment from going into effect.

I agree that in the light of our prior cases and congressional re-enactment of § 5, that section must be held to reach state reapportionment statutes. Contrary to the Court, however, it is my view that the Attorney General did not interpose an objection contemplated by § 5 and that there was therefore no barrier to the March 9 reapportionment going into effect.

It is arguable from the sparse language of the Act, which merely says that the State's modification will go

into effect unless the Attorney General enters an objection, that any objection whatsoever filed by that official will suffice to foreclose effectiveness of the new legislation and force the State into the District Court with the burden of proving that its law is not unconstitutional. I cannot believe, however, that Congress intended to visit upon the States the consequences of such uncontrolled discretion in the Attorney General. Surely, objections by the Attorney General would not be valid if that officer considered himself too busy to give attention to § 5 submissions and simply decided to object to all of them, to one out of 10 of them or to those filed by States with governors of a different political persuasion. Neither, I think, did Congress anticipate that the Attorney General could discharge his statutory duty by simply stating that he had not been persuaded that a proposed change in election procedures would not have the forbidden discriminatory effect. It is far more realistic and reasonable to assume that Congress expected the Attorney General to give his careful and good-faith consideration to § 5 submissions and, within 60 days after receiving all information he deemed necessary, to make up his mind as to whether the proposed change did or did not have a discriminatory purpose or effect, and if it did, to object thereto.

Although the constitutionality of § 5 has long since been upheld, *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966), it remains a serious matter that a sovereign State must submit its legislation to federal authorities before it may take effect. It is even more serious to insist that it initiate litigation and carry the burden of proof as to constitutionality simply because the State has employed a particular test or device and a sufficiently low percentage of its citizens has voted in its elections. And why should the State be forced to shoulder that burden where its proposed change is so colorless that the

country's highest legal officer professes his inability to make up his mind as to its legality? If he is to object, must he not himself conclude that the proposed change will have the forbidden purpose or effect? Given such a proper objection, the matter would take on a familiar adversary cast; and there would then appear to be a solid basis—at least the probable cause that a federal charge usually imports—for insisting on judicial clearance. Moreover, the issues between the State and the United States, as well as the litigative burden the State would have to bear, could be known and examined and intelligent decision made as to whether to institute suit in the District Court. As it is, the State may be left more or less at sea; for the Attorney General need merely announce that he is not at all convinced that the law submitted to him is not discriminatory.

My idea as to the obligation of the Department of Justice with respect to a submission under § 5 is similar to what Congress itself has provided in § 4, 42 U. S. C. § 1973b (a). Under that provision, a State otherwise covered by the Act can terminate coverage as to it by securing a declaratory judgment that no discriminatory test or device has been used during the past 10 years. In that litigation, the section goes on to provide, the Attorney General must consent to the entry of such a judgment if "he has no reason to believe" that a discriminatory test or device has been used during the 10 years preceding the filing of the action. Thus, in even the far more important context of determining whether a State is in any respect covered by the Act, the Attorney General, if he is to object to a decree favorable to the State, must have reason to believe, and so state, that tests or devices with the prohibited effect have been employed in the past. Surely, where the issue is not termination *vel non*, but the purpose and effect of a single statute, regulation, or other modification of voting procedures, it

is not untoward to insist that the Attorney General not object to the implementation of the change until and unless he has reason to believe that the amendment has the prohibited purpose or effect. He should not be able to object by simply saying that he cannot make up his mind or that the evidence is in equipoise.

MR. JUSTICE POWELL, dissenting.

For the reasons stated in his opinion, I agree with MR. JUSTICE WHITE that the Attorney General did not comply with § 5 of the Voting Rights Act, 42 U. S. C. § 1973c, and that therefore Georgia's reapportionment act should have been allowed to go into effect. It is indeed a serious intrusion, incompatible with the basic structure of our system, for federal authorities to compel a State to submit its legislation for *advance* review.* As a minimum, assuming the constitutionality of the Act, the Attorney General should be required to comply with it explicitly and to invoke its provisions only when he is able to make an affirmative finding rather than an ambivalent one.

---

*As Mr. Justice Black stated, the power vested in federal officials under § 5 of the Act to veto state laws in advance of their effectiveness "distorts our constitutional structure of government." *South Carolina* v. *Katzenbach*, 383 U. S. 301, 358 (1966) (concurring and dissenting). A similar appraisal was made by Mr. Justice Harlan, who characterized § 5, as construed by the Court, as "a revolutionary innovation in American government." *Allen* v. *State Board of Elections*, 393 U. S. 544, 585 (1969) (concurring and dissenting). I have no doubt as to the power of the Congress under the Fifteenth Amendment to enact appropriate legislation to assure that the rights of citizens to vote shall not be denied, abridged, or infringed in any way "on account of race, color, or previous condition of servitude." Indeed, in my view there is more than a power to enact such legislation, there is a duty. My disagreement is with the unprecedented requirement of advance review of state or local legislative acts by federal authorities, rendered the more noxious by its selective application to only a few States.