**Melville HERRON, and all persons similarly situated, Plaintiff,**

**v.**

**Edward I. KOCH, et al., Defendants.**

**Carl ANDREWS, et al., Plaintiffs,**

**v.**

**Edward I. KOCH, et al., Defendants.**

**Gilberto GERENA–VALENTIN, and on behalf of Puerto Rican voters similarly situated, Plaintiff,**

**v.**

**Edward I. KOCH, et al., Defendants.**

**Nos. 81 Civ. 1956, 81 Civ. 1542 and 81 Civ. 5468.**

United States District Court, E. D. New York. United States District Court, S. D. New York.

Sept. 8, 1981.

Paul Wooten, Brooklyn, N. Y., New York State Black & Puerto Rican Legislative Caucus, for plaintiff Melville Herron.

Kim Hoyt Sperduto, LeBoeuf, Lamb, Leiby & MacRae, New York City, for plaintiffs in Andrews, et al. v. Koch, et al.

Gabe Kaimowitz, Puerto Rican Legal Defense and Education Fund, Inc., New York City, for plaintiff Gerena-Valentin.

Patrick F. X. Mulhearn, New York City Law Dept., New York City, for defendants other than Stanley Friedman.

Paul A. Victor, New York City, for defendant Stanley Friedman.

Paul Hancock, Civil Rights Div., Dept. of Justice, Washington, D. C., John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, of counsel, for the United States as amicus curiae.

Before KEARSE, Circuit Judge, and NEAHER and DUFFY, District Judges:

## MEMORANDUM AND ORDER

PER CURIAM.

This three-judge district court has been convened pursuant to 28 U.S.C. § 2284 to hear claims in three cases, consolidated for this purpose, that certain plans of the City of New York ("City") with respect to its primary and general elections scheduled for September 10 and November 2, 1981, respectively, violate § 5 of the Voting Rights Act of 1965, as amended (hereafter "Voting Rights Act" or the "Act"), 42 U.S.C. § 1973c (1976).[1] Plaintiffs have moved for a preliminary injunction prohibiting the City, its officials, and its Board of Elections from holding these elections as planned because the City has not obtained the necessary federal approval of its changes in voting standards, practices and procedures. For the reasons set forth below, we grant the motions.

---

1. Section 5 provides that "[a]ny action" thereunder shall be heard by a three-judge district court in accordance with 28 U.S.C. § 2284.

## BACKGROUND

### A. Requirements of the Voting Rights Act

■ Congress's purpose in enacting the Voting Rights Act was to rid the country of racial discrimination in voting. *Allen v. State Board of Elections*, 393 U.S. 544, 548, 89 S.Ct. 817, 822, 22 L.Ed.2d 1 (1969); *South Carolina v. Katzenbach*, 383 U.S. 301, 308, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966). In substance, §§ 2 and 4(f)(2) of the Act prohibit any State or political subdivision from imposing or applying any qualifications or prerequisites for voting, or practices, procedures, or standards with respect to voting, that have the purpose or will have the effect of discriminating on the basis of race, color, or membership in a language minority group. 42 U.S.C. §§ 1973, 1973b(f)(2).[2] In practice, § 5 of the Act prohibits any State or political subdivision subject to § 5

of the Act[3] from enforcing any change in voting qualifications, prerequisites, practices, procedures or standards unless it has either (1) obtained a declaratory judgment from the United States District Court for the District of Columbia that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race[,] color, or [membership in a language minority]," or (2) submitted the proposed change to the Attorney General of the United States "and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made." 28 U.S.C. § 1973c.[4]

2. Section 2 of the Act, 42 U.S.C. § 1973, provides:

No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2).

Section 4(f) of the Act, 42 U.S.C. § 1973b(f), provides, in part:

(1) The Congress finds that voting discrimination against citizens of language minorities is pervasive and national in scope. Such minority citizens are from environments in which the dominant language is other than English. In addition they have been denied equal educational opportunities by State and local governments, resulting in severe disabilities and continuing illiteracy in the English language. The Congress further finds that, where State and local officials conduct elections only in English, language minority citizens are excluded from participating in the electoral process. In many areas of the country, this exclusion is aggravated by acts of physical, economic, and political intimidation. The Congress declares that, in order to enforce the guarantees of the fourteenth and fifteenth amendments to the United States Constitution, it is necessary to eliminate such discrimination by prohibiting English-only elections, and by prescribing other remedial devices.

(2) No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the

right of any citizen of the United States to vote because he is a member of a language minority group.

3. A State or political subdivision becomes subject to § 5 of the Act when (1) the Attorney General determines that the jurisdiction maintained any of a list of requirements (specified in § 4(c) of the Act) as a prerequisite for voting or registration for voting on November 1, 1964, 1968, or 1972; and (2) the Director of the Census determines that fewer than 50% of the persons of voting age residing in the jurisdiction were registered on the corresponding date, or voted in the presidential election of the corresponding month. Such determinations become effective upon publication in the Federal Register. Voting Rights Act, § 4(b), 42 U.S.C. § 1973b(b).

4. Section 5 of the Act, 42 U.S.C. § 1973c, provides:

Whenever a State or political subdivision with respect to which the prohibitions set forth in section 4(a) [42 U.S.C. § 1973b(a)] based upon determinations made under the first sentence of section 4(b) [42 U.S.C. § 1973b(b)] are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 4(a) based upon determinations made under the second sentence of section 4(b) are in effect shall enact or seek to administer any voting qualification or prereq-

## B. *The City's Plan*

Pursuant to the City's Charter, the City's Council Districting Commission (the "Commission") is required "to provide a draft plan for dividing the City into council districts ... at the first regular election of council members after each federal census ...." Following receipt of the results of the 1980 census on April 1, 1981, the Commission presented such a draft plan to the New York City Council. On May 29, 1981 the Council adopted the proposed plan; and on June 6, defendant Mayor Edward I. Koch signed the bill, Local Law 47, into law. Prior to the adoption of Local Law 47, the City had 33 councilmanic districts, each entitled to elect a single Councilman; in addition each of the five boroughs of the City[5] was entitled to elect two Councilmen on an at-large basis.

Local Law 47 did not disturb the at-large councilmanic seats. It did, however, increase the number of district councilmanic seats from 33 to 35, and it redrew district lines. In addition, the plan adopted by the City changes approximately 300 of the 3000 election districts in Bronx, Kings, and New York counties, and hence relocates certain polling places.

The City concedes that these changes are within the coverage of the Voting Rights Act,[6] that the counties of Bronx, Kings, and New York are political subdivisions subject to the Act,[7] and that the City was required

uisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 4(a) based upon determinations made under the third sentence of section 4(b) are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 of the United States Code and any appeal shall lie to the Supreme Court.

**5.** The five boroughs, each of which is a county, are Bronx (Bronx County), Brooklyn (Kings County), Manhattan (New York County), Queens (Queens County), and Staten Island (Richmond County).

**6.** Section 5 has "the broadest possible scope," applying to any enactment altering the election law in even a minor way. *Allen v. State Board of Elections,* 393 U.S. 544, 566–67, 89 S.Ct. 817, 832–33, 22 L.Ed.2d 1 (1969). In particular, § 5 covers new or revised reapportionment plans, *United Jewish Organizations of Williamsburgh, Inc. v. Carey,* 430 U.S. 144, 157, 97 S.Ct. 996, 1005, 51 L.Ed.2d 229 (1977), and changes in the locations of polling places, *Perkins v. Matthews,* 400 U.S. 379, 387, 91 S.Ct. 431, 436, 27 L.Ed.2d 476 (1971).

**7.** In New York State, three boroughs, the Bronx, Brooklyn, and Manhattan, are subject to the Act. 42 U.S.C. § 1973b(b), 35 Fed.Reg. 12,354 (1970), 36 Fed.Reg. 5,809 (1971). *See*

to obtain preclearance from the District Court for the District of Columbia or from the Attorney General:

There is no dispute among the parties, that the "change" or new councilmanic redistricting plan is "covered" by § 5 of the Voting Rights Act and thus, required to be precleared before implementation.

(Defendants' Memorandum of Law at 13.) Nor does the City dispute that it is not entitled to enforce these changes in the absence of preclearance:

[I]f a change occurred and was not precleared, then it is unlawful and may not be enforced.

(*Id.* at 8.)

On June 12, 1981, within one week after Local Law 47 was signed into law, the City submitted, by hand delivery, its proposed changes in councilmanic districts to the Attorney General,[8] and requested an expedited review of its submission, stating that the first date set to circulate petitions with respect to councilmanic seats was June 16, 1981. On August 4, 1981, the Department of Justice wrote to the City, stating that after a careful examination of the City's initial submission, it had been determined that the information sent was

insufficient to enable the Attorney General to determine that the proposed changes do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group.

(Letter dated August 4, 1981, from Wm. Bradford Reynolds, Assistant Attorney General, Civil Rights Division, Department of Justice, to Fabian Palomino, Esq., Counsel to New York City Council Redistricting Commission.) The letter specified eight types of information to be provided, including election results by election district for certain past elections, a map indicating the election districts in relation to the councilmanic districts as they now exist and the proposed new district lines, and data supporting or refuting the City's contention that one reason that the submitted plan does not contain additional districts in which minorities comprise a substantial majority of the population is that the minority populations are dispersed throughout the City. (*Id.* at 1–2.)

The August 4 letter alerted the City that the 60 days within which the Attorney General could consider the City's submission would commence on his receipt of the information necessary for the proper evaluation of the submission, and that in the absence of additional information the Attorney General might object to the proposed changes. It asked the City to notify the Department within twenty days whether the City planned to comply with the request. (*Id.* at 3.)

The City has informed the Attorney General that it will comply with the request for additional information. On August 14, the requested information in one of the eight categories, to wit, past election results, was submitted to the Attorney General. In addition, the City has provided some additional information in some of the other categories, but apparently has not yet completed its compliance in any of the other seven categories. The City expects to complete its submission by September 21, 1981.

C. *The Present Lawsuits*

The first of the present lawsuits, *Herron v. Koch, et al.*, was commenced on June 16, 1981. The plaintiff, a black voter residing in Brooklyn, alleged that the City's changes violated the Voting Rights Act. Herron quickly moved for a preliminary injunction

---

*United Jewish Organizations of Williamsburgh, Inc. v. Wilson*, 510 F.2d 512, 515–16 (2d Cir. 1975), *aff'd sub nom. United Jewish Organizations of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977); 46 Fed.Reg. 880 (1981).

**8.** There appears to be a dispute as to whether the City has submitted the changes in election districts to the Attorney General for approval. The City contends that it has done so, although not in its initial submission on June 12; certain of the plaintiffs contend that these changes have never been submitted. For the purposes of these motions we shall assume that the City has submitted these changes.

against implementation of the changes on the ground that the City had not obtained the requisite federal approval under the Act. The City opposed the motion principally on the ground that it had submitted its changes to the Attorney General pursuant to the Act, and that the 60 days within which the Attorney General could object would expire on August 11, 1981, prior to the elections to be affected. On June 17, 1981, the district court denied Herron's motion for an injunction on the grounds that it was premature and that the allegations of the complaint were conclusory.

On August 5, 1981, *Andrews, et al. v. Koch, et al.*, was commenced by three registered voters residing in Brooklyn, including at least one black voter and at least one voter of Puerto Rican or Hispanic heritage. The *Andrews* plaintiffs alleged that although the total population of the City had declined from 7,895,563 in 1970 to 7,071,030 in 1980, the minority population had increased in that period by at least 319,676. They challenged the City's councilmanic changes as having the purpose and effect of "freezing" the 1970 number of minority councilmembers while increasing the number of white councilmembers, and alleged that the City had not obtained preclearance of its changes as required by § 5 of the Act. *Gerena-Valentin v. Koch, et al.*, was commenced on September 2, 1981, by a Puerto Rican voter and incumbent Councilman in the Bronx, alleging that the City's changes had the purpose and effect of discriminating against Puerto Rican and other Hispanic voters.[9]

On August 31, 1981, Herron filed an amended complaint and, alleging that the City had not obtained the preclearance required by § 5 of the Voting Rights Act, moved to enjoin the City from enforcing its changes at the primary election scheduled for September 10, 1981, and thereafter until

preclearance is forthcoming. Herron contends that the councilmanic elections will be affected by the increase and redesign of the councilmanic districts, and that all elections will be affected by the changes in election districts. Gerena-Valentin has moved for a similar injunction against enforcement of the changes at the primary and general elections, the latter being scheduled for November 3, 1981. The *Andrews* plaintiffs have joined these motions insofar as they seek to enjoin the councilmanic elections but not insofar as they seek to enjoin the elections for other local and Citywide offices such as county district attorneys and Mayor of the City.

The City opposes the motions on the ground that the plaintiffs have not demonstrated that they will be irreparably harmed if the elections are permitted to proceed as scheduled. Pointing out that much time and money has been spent in preparation for the primary election, the City contends that primary candidates will be irreparably harmed by the granting of an injunction. If preclearance is not forthcoming, the City argues, a new election would adequately protect affected voters' rights.

## DISCUSSION

■ The responsibility of a three-judge court convened under § 5 of the Voting Rights Act is a substantively restricted one. We have no authority to determine whether or not the proposed changes are likely to have a discriminatory purpose or effect. We must decide only (1) whether the change is covered by § 5, (2) if the change is covered, whether the § 5 requirements were satisfied, and (3) if the requirements were not satisfied, what remedy is appropriate. *United States v. Board of Supervisors of Warren County, Mississippi*, 429 U.S. 642, 645–47, 97 S.Ct. 833, 834–35, 51 L.Ed.2d 106

9. Gerena-Valentin also alleged other wrongs by the City, including the rejection of certain voter petitions on his behalf and the removal of his name from the ballot. The *Andrews* complaint asserts a variety of other claims, including the charge that the allotment of two at-large seats to each of the City's boroughs when Brooklyn

has a population of 2,230,936 as compared with Staten Island's population of 352,121, violates their constitutional rights. As a three-judge court we are convened only to hear claims arising under § 5 of the Voting Rights Act and we do not address the various plaintiffs' other claims.

(1977); *Perkins v. Matthews*, 400 U.S. 379, 383–86, 91 S.Ct. 431, 434–35, 27 L.Ed.2d 476 (1971); *Allen v. State Board of Elections*, 393 U.S. 544, 555 n.19, 558–59, 89 S.Ct. 817, 826 n.19, 827–28, 22 L.Ed.2d 1 (1969).

This narrowly confined task is to an extent simplified in the present cases, because the City has conceded that its changes are covered by the Act, that preclearance was required by § 5 before the changes could become effective, and that it has not obtained preclearance as required by § 5. Thus we must fashion an appropriate remedy.

Since Section 5 provides that the City is barred from enforcing its changes if it fails to obtain one of the forms of preclearance required by that section, the Supreme Court has indicated in a variety of circumstances that an injunction against the holding of an election is an appropriate remedy for violation of § 5. *See Allen v. State Board of Elections, supra*, 393 U.S. at 555, 89 S.Ct. at 826:

> [A]fter proving that the State has failed to submit the covered enactment for § 5 approval, the private party has standing to obtain an injunction against further enforcement, pending the State's submission of the legislation pursuant to § 5.

In *Georgia v. United States*, 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973), a suit commenced by the Attorney General after he had rejected two State legislative redistricting plans submitted to him, the Supreme Court affirmed the decision of a three-judge district court that the State should be enjoined from holding elections pursuant to its plans. Prior to its own decision, the Supreme Court had stayed the district court's injunction, with the consequence that the election was in fact held. This procedural circumstance, however, did not prevent the Supreme Court from affirming the injunction as proper. In *Holt v. City of Richmond*, 406 U.S. 903, 92 S.Ct. 1602, 31 L.Ed.2d 814 (1972), the Supreme Court granted an application to enjoin elections scheduled to be held days later, where the proposed changes were squarely within the meaning of § 5 and the Attorney General had objected. *See also United States v. Board of Supervisors*, 429 U.S. 642, 645, 97 S.Ct. 833, 834, 51 L.Ed.2d 106 (1977):

> No new voting practice or procedure may be enforced unless the State or political subdivision has succeeded in its declaratory judgment action or the Attorney General has declined to object to a proposal submitted to him.... Attempts to enforce changes that have not been subjected to § 5 scrutiny may be enjoined by any three-judge district court in a suit brought by a voter, *Allen v. State Board of Elections*, 393 U.S. 544, 554–563, 89 S.Ct. 817, 825–830, 22 L.Ed.2d 1 (1969)....

On the basis of the strong language of § 5 and the above indications from the Supreme Court, a number of district courts have granted injunctions against impending elections in cases similar to those presented here. *E. g., Beer v. United States*, 374 F.Supp. 357, 362 (D.D.C.1974) (three-judge court stating that "[s]ection 5 itself enjoined any election utilizing the new district boundaries specified in the plan. Our injunction ... merely spelled out the statutory prohibition against councilmanic elections under the plan. Our order imposed no restriction upon the election of councilmen ... beyond observance of the statutory mandate."), *final judgment on merits*, 374 F.Supp. 363, *vacated and remanded*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976); *Heggins v. City of Dallas*, 469 F.Supp. 739, 742–43 (N.D.Tex.1979) (three-judge court) (it is "eminently more equitable to all concerned to delay the election rather than to allow an election in direct contravention of the Voting Rights Act."); *Matthews v. Leflore County Board of Election Commissioners*, 450 F.Supp. 765, 768 (N.D.Miss.1978) (three-judge court); *Horry County v. United States*, 449 F.Supp. 990, 996–97 (D.D.C.1978) (three-judge court); *White v. Dougherty County Board of Education*, 431 F.Supp. 919, 920 (M.D.Ga.1977) (three-judge court), *aff'd*, 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978); *Pitts v. Carter*, 380 F.Supp. 4 (N.D.Ga.1974).

Other courts have denied injunctions for various reasons. In *Wilson v. North Carolina State Board of Elections*, 317 F.Supp. 1299 (M.D.N.C.1970) (three-judge court), for example, the court recognized that the proper remedy was an injunction against the enforcement of the unapproved changes, but declined to enjoin the next election due to its "proximity". In *U.S. v. County Commission, Hale County, Alabama*, 425 F.Supp. 433 (S.D.Ala.1976) (three-judge court), *aff'd mem.*, 430 U.S. 924, 97 S.Ct. 1540, 51 L.Ed.2d 768 (1977), the court preferred to permit the challenged election to proceed, pending preclearance. If federal approval could not be obtained, a new election was to be held promptly, following the old procedures. Three elections had already been held under the challenged changes, so an injunction would merely have allowed incumbents to remain in office who had themselves been improperly elected.

■ On the basis of all the circumstances of the present cases, we conclude that an injunction prohibiting the City from holding primary or general elections until such time as the Attorney General has acted or declined to act on the City's submission pursuant to § 5 (or until some other preclearance envisioned by § 5 is obtained) is the most appropriate way to give effect to § 5. Among the principal factors that lead us to this conclusion are the facts that the plaintiffs have done all in their power to preserve their rights under the Act, and that the City has not done all it could to comply with the Act.

The plaintiffs have expeditiously done all that is required of them to seek adequate protection of their rights. Herron instituted suit within two weeks of the Mayor's signing Local Law 47, and immediately sought to enjoin the City's use of the changes. This suit was brought on the first day councilmanic petitions could be filed, arguably before any candidate would have expended large amounts of money and en-

ergy in seeking office, and apparently before the City had expended much of the needed effort to implement the planned changes.[10] The injunction requested was denied on the ground that, as the City argued, the motion was premature because the City had requested preclearance of the changes from the Attorney General.

■ But the City has not obtained the preclearance because its submission to the Attorney General was inadequate to permit that official to determine whether or not the City's plan had a discriminatory purpose or will have a discriminatory effect. Although the City attempts to avoid responsibility for the delay in action by the Attorney General, we are unpersuaded that, vis-a-vis the plaintiffs, the City should not bear the complete responsibility for its noncompliance with § 5. For example, the City states that before delivering its submission to the Department of Justice it telephoned to inquire whether its proposed submission would be adequate and was advised, both in that call and upon delivery, that the Department would require nothing more. Yet § 51.26 of the Regulations promulgated by the Attorney General plainly state that review will be facilitated if certain information, not required by § 51.25, is provided by the submitting party. 46 Fed.Reg. 876 (1981). Four of the eight categories of additional information sought by the Attorney General on August 4, 1981, were obviously covered by this regulation, of which the City was aware. Knowing that this information would facilitate action, the City consciously elected not to provide it because it was not technically required. Thus, while we do not intend to suggest that the City proceeded in bad faith, we find that it consciously chose a course of action that was not designed to facilitate a swift and complete review by the Attorney General. Further, it is scarcely an answer that the Attorney General asked for this information only after receiving statements from a number of minority groups opposing the

---

**10.** For example, we were informed at oral argument that the cards sent by the City to all registered voters advising them of their election districts and polling places were not mailed until the end of July.

City's plan: such opposition should certainly have been anticipated by the City, which had itself received strenuous opposition from such groups in the course of considering what changes to adopt. Since the Act was designed to place on the submitting party not only the burden of proving non-discrimination with respect to its voting plans, *see Georgia v. United States, supra,* 411 U.S. at 538, 93 S.Ct. at 1709, but also the burden of any delays in the process *see Perkins v. Matthews, supra,* 400 U.S. at 396, 91 S.Ct. at 440, we believe the City should bear the consequences of its decision not to submit to the Attorney General several types of data that it knew would facilitate his decision.

 The City argues that we should deny the plaintiff injunctive relief now, with the thought that if the Attorney General eventually objects to the City's changes, a new election could be required. We do not consider the ordering of a new election to be the most appropriate remedy in the circumstances of these cases, nor to be an adequate remedy here for the violation, assumed arguendo, of the plaintiffs' rights to vote free from discrimination. The right to vote is unique and should not be diluted either by forbidden acts or by the normal attrition of voter turn-out at a re-held election.[11]

 Finally, we are unpersuaded by the City's current argument that injunctive relief should be denied at this stage because the date of the primary election is but two days away, and that in the time since Herron's first motion, candidates and the City have spent irrecoverable time and money preparing for the elections. If Herron's earlier motion was premature, and we agree that an injunction was properly denied on that basis, and the present motion is to be denied on the ground that in the interval energies and monies have been expended that would make an injunction work hardship on the City and the candidates, we are at a loss to guess at what time the voters could sensibly hope to enjoin a City, that has not complied with § 5, from enforcing its changes.

In short, we believe that to allow the City to go forward with the planned elections with the implementation of its changes and without preclearance in a circumstance where the applicability of § 5 is conceded, and where a determination by the Attorney General pursuant to § 5 has been impeded by the City's failure to provide adequate information, would effectively nullify the intended thrust of the section. We will not willingly invite political entities subject to § 5 to avoid its impact so easily.

The defendants are therefore enjoined from conducting any election in which the City's changes of the number and boundaries of councilmanic districts and the changes of election districts [12] are enforced,

---

**11.** Nor do we find attractive the alternative suggested by the United States as amicus curiae. A representative of the Attorney General urged that we deny an injunction against the holding of the primary election on September 10, in hopes that preclearance by the Attorney General will be forthcoming prior to the general election of November 3. That representative stated that, assuming the City were able to complete its provision of the additional information requested by September 21, the Attorney General would hope that he could act within thirty days thereafter, and that it would attempt to act in advance of the November 3 election. Such an alternative would fare well only if the hoped-for schedule were met, and if the Attorney General did not object to the City's plans. If an objection were forthcoming, the right to vote in an untainted primary would have been lost or diluted, and if a new primary election were ordered it could well require the postponement of the general election. Moreover, the record in this matter of the activities of both the City and the Department of Justice gives us no particular confidence that the hoped-for dates for final submission by the City and final decision by the Attorney General will be met. In fact, even if the City completes its submission by September 21, the Attorney General is allowed until November 20, well past the date of the general election, to object. The result could be that two invalid elections were held in circumstances in which the Act says the City could not enforce its changes.

**12.** We recognize that this injunction will prohibit the September 10 primary elections for such offices as Mayor, Comptroller, District Attorneys and borough presidencies and possibly other contests in the Bronx, Brooklyn, and Manhattan.

until the provisions of § 5 of the Voting Rights Act have been complied with. It is

SO ORDERED.