Hugh M. WILSON, Plaintiff,

v.

NORTH CAROLINA STATE BOARD OF ELECTIONS, Durham County Board of Elections, Person County Board of Elections, and the Orange County Board of Elections, Defendants.

No. C–68–D–70.

United States District Court,
M. D. North Carolina,
Durham Division.

Argued Sept. 9, 1970.

Decided Oct. 8, 1970.

James B. Craven, III, of Everett, Everett & Creech, Durham, N. C., for plaintiffs.

James F. Bullock, Varina, N. C., and James L. Blackburn, Raleigh, N. C., for defendant North Carolina State Board of Elections.

Lucius M. Cheshire, of Graham & Cheshire, Hillsborough, N. C., for defendant Orange County Board of Elections.

Robert D. Holleman, Durham, N. C., for defendant Durham County Board of Elections.

Charles B. Wood, Roxboro, N. C., for defendant Person County Board of Elections.

Before WINTER, Circuit Judge, BUTLER, Chief Judge, and GORDON, District Judge.

## OPINION OF THE COURT

GORDON, District Judge.

The plaintiff, Hugh M. Wilson, is a resident of Orange County, North Carolina. He has sought to have his name placed on the ballot for the Democratic Party's nomination for state senator from the 11th Senatorial District which is comprised of Orange, Durham and Person Counties.

On January 15, 1968, the Democratic Party Executive Committees of the counties in this senatorial district, by their respective chairmen, executed an agreement popularly known as a Rotation Agreement, pursuant to North Carolina General Statute § 163–116,[1] whereby, insofar as the Democratic Party was concerned, Durham County would be enti-

---

1. "When any senatorial district consists of two or more counties, in one or more of which the manner of nominating candidates for legislative offices is regulated by statute, and the privilege of selecting the candidate for Senator, or any one of the candidates for Senator, of any political party (as the words 'political party' are defined in § 163–96) in the senatorial district, is, by agreement of the several executive committees representing that political party in the counties constituting the district, conceded to one county therein, such candidate may be selected in the same manner as the party's candidates for county officers in the county, whether in pursuance of statute or under the plan of organization of such party. All nominations of party candidates for the office of Senator, made as hereinbefore provided, shall be certified by the chairman of the county board of elections of the county in which the nomination is made, to each chairman of the county board of elections in all of the counties constituting the senatorial district, and it shall be the duty of each chairman of the other counties to which

tled to a senator for the 1969, 1971, 1973 and 1975 sessions of the General Assembly of North Carolina; Person County would be entitled to one senator for the 1969 and 1971 sessions; and Orange County would be entitled to a senator for the 1973 and 1975 sessions.

Because of this agreement, the defendant County Boards of Elections and the defendant State Board of Elections would not certify the plaintiff's name for placement on the May 2, 1970 primary ballot. Plaintiff now attacks G.S. § 163–116 and this Rotation Agreement executed under the authority of this statute as contravening § 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c.

Under this section, even though a State or political subdivision thereof might pass a "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964", failure to comply with this new enactment can deprive no person of the right to vote until the State seeks and is awarded a declaratory judgment from the District Court for the District of Columbia holding that the new enactment "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." An alternative method for approving a new enactment is to submit that enactment to the Attorney General of the United States, and if within sixty days the Attorney General does not object to the enactment, the State may enforce the same.

It is admitted that defendants did not institute an action for a declaratory judgment in the District Court for the District of Columbia pursuant to § 5 of the Act. Proof was offered that G.S. § 163–116 was submitted to the Department of Justice on three occasions after the effective date of the Voting Rights Act—both before and after 1967. The proof was the same which we discussed in deciding the companion case. See Clayton v. North Carolina State Board of Elections, E.D.N.C., 317 F.Supp. 915, decided October 1, 1970. No claim is made that the Rotation Agreement executed under the authority of G.S. § 163–116 was ever submitted to the Attorney General or the Department of Justice.

■ Section 5 of the Voting Rights Act further provides that any matter arising thereunder shall be heard by a court of three judges in accordance with the provisions of 28 U.S.C. § 2284. This particular Three Judge Court is properly constituted as provided for by § 5 of the Voting Rights Act, even though the Rotation Agreement covers only three counties and even though only one county of those three is subject to coverage by the Act. Section 5 is directed not only at "States" but also at "political subdivisions" thereof and no distinction is made between actions affecting either. It is also worthy of note that § 5 refers to 28 U.S.C. § 2284 and not 28 U.S.C. § 2281. Section 2284 deals with the composition of and the procedure to be used by a three judge court. Section 2281 deals with the matters for which a three judge panel can be formed to hear. Section 5 of the Voting Rights Act supplants § 2281 in this situation and the cases decided under § 2281 as to the jurisdiction of a three judge court would be inapplicable here. Furthermore, although Person County is the only county covered by the Voting Rights Act, the terms and provisions of the Rotation Agreement are so intertwined and so dependent upon Person County's participation that the inclusion of the other two counties is necessary for a full and fair adjudication of compliance or failure to comply with the mandate of the Voting Rights Act.

■ Allen v. Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) sets out the limited jurisdiction and authority granted under the Act for this Three Judge Court:

"A declaratory judgment brought by the *State* pursuant to § 5 re-

---

the nominations are certified to print the name or names of the nominee or nominees

on the official county ballot for the general election."

quires an adjudication that a new enactment does not have the purpose or effect of racial discrimination. However, a declaratory judgment action brought by a *private litigant* does not require the Court to reach this difficult substantive issue. The only issue is whether a particular state enactment is subject to the provisions of the Voting Rights Act, (sic) and therefore must be submitted for approval before enforcement. The difference in the magnitude of these two issues suggests that Congress did not intend that both can be decided only by the District of Columbia District Court. Indeed, the specific grant of jurisdiction to the district courts in § 12(f) indicates Congress intended to treat 'coverage' questions differently from 'substantive discrimination' questions." 393 U.S. at 558, 89 S.Ct. at 828, 22 L.Ed.2d at 13.

Therefore, by virtue of the power granted to it by the Voting Rights Act, this Three Judge Court can only determine whether the enactment in question is subject to coverage by the Act. If so, then enforcement of the enactment, as made operative by the Rotation Agreement, should be enjoined until such time as the State pursues to successful completion the procedures set out in § 5. The question as to whether the enactment has as its purpose or effect racial discrimination is not for this Court to decide. Furthermore, due to the relief hereinafter granted pursuant to the Voting Rights Act, this Court will not undertake to resolve the issues presented by plaintiff involving equal protection and due process of law. Those issues may be mooted as a result of proceedings under § 5 or as a result of further enactments by the General Assembly of North Carolina resulting from the decision in this case or the decision with regard to future proceedings under § 5.

■ It is a stipulation of fact in this case that G.S. § 163–116 was first enacted in 1911 by C. 192 P.L. 1911 and has remained substantially unchanged; that C. 775 P.L.1967 recodified Chapter 163 of the General Statutes of North Carolina of which 163–116 is a part. Plaintiff claims that the mere reenactment of Chapter 163 by the 1967 General Assembly is enough to bring this section contained therein under the purview of § 5 of the Act, in that G.S. § 163–116 was not enacted until 1967. The Court does not agree. There were only two changes made by the 1967 General Assembly: (a) a change in the number of the section, and (b) a change in the text as to where to refer to find the definition of "political party." These two changes do not constitute a "difference" contemplated in the wording of § 5, i. e., "different from that in force or effect on November 1, 1964. * * *"

■ However, the January 15, 1968, Rotation Agreement and the subsequent effects thereof do result in a situation "different from that in force or effect on November 1, 1964." Defendants have argued that the Rotation Agreement found its genesis in the actions of a political party and was not, therefore, an enactment of a State or political subdivision which is covered by the Voting Rights Act. Although this is true, the Rotation Agreement would have no practical effect without the cooperation of the defendants. The Rotation Agreement has the force and effect of a legislative enactment by virtue of G.S. § 163–116 and by virtue of the subsequent failure by the defendants to place the plaintiff's name on the May 2, 1970, primary ballot. Allen v. Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) interprets the Voting Rights Act as covering any enactment by the state or a political subdivision thereof which changes the election laws of that entity "in even a minor way." 393 U.S. at 566, 89 S.Ct. at 832, 22 L.Ed.2d at 17. By virtue of arrangements made pursuant to G.S. § 163–116 and the Rotation Agreement the members of the Democratic Party who reside in Orange County would have no vote in the primary elections insofar as a state senator for the 1969 and 1971 sessions of the General Assembly was concerned. The same would be true for

those members of the Democratic Party who reside in Person County when the time came to select a candidate for the 1973 and 1975 sessions of the General Assembly.[2] This is a "voting qualification or prerequisite to voting, or standard, practice or procedure with respect to voting different from that in force or effect on November 1, 1964" and is therefore subject to the provisions of § 5 of the Voting Rights Act of 1965.

 The proper remedy in such a situation is the issuance of an injunction against the enforcement of the Rotation Agreement by the named defendants. But additionally, the plaintiff has filed an additional prayer for relief to the effect that the Court order that a special primary election be held in the 11th Senatorial District prior to the general election on November 3, 1970. Although this additional prayer for relief was filed on June 8, 1970, in the Order on Pre-Trial Conference, filed June 11, 1970, all parties had stipulated that the final date for filing briefs would not be until September 7, 1970. Notwithstanding the stipulation, the Court raised the question of whether ordering a special primary election, if deemed appropriate, would be feasible if the hearing of the case were postponed until after September 7, 1970; however, counsel reaffirmed the time schedule they had proposed. On September 9, 1970, the second day following the time counsel had asked the Court to set for filing briefs, the matter was heard by this panel of three judges. Due to the proximity of the date of the general election, the Court concludes that an order requiring that a special primary be held in this senatorial district would be neither reasonable nor practical and that an injunction against enforcement of the Rotation Agreement should not be effective until after the general election to be held on November 3, 1970. The mechanics involved in the conduct of a special primary which would be fair to the candidates and the voters require more time than is presently available. Ballots would have to be printed, absentee ballots would have to be mailed, the candidates would have to have time in which to present their proposed programs and platforms to the voters. Furthermore, there is the possibility of the necessity of a runoff election if the results of a special primary should prove to be inconclusive. And even if a special primary could possibly be held on such short notice, the amount of time between that and the general election would be extremely abbreviated. Therefore, as an equitable matter, the Court finds that relief such as the plaintiff has requested should not be granted. See Chavis v. Whitcomb, 305 F.Supp. 1364 (S.D.Ind.1969), stay granted 396 U.S. 1055, 90 S.Ct. 748, 24 L.Ed.2d 757, stay continued 396 U.S. 1064, 90 S.Ct. 761, 25 L.Ed.2d 82 (1970); Maryland Citizens for Representative General Assembly et al. v. Governor of Maryland et al., 4 Cir., 429 F.2d 606 (1970).

A judgment in accord with this decision shall be entered contemporaneously with this Opinion.

## JUDGMENT

For the reasons stated in the Opinion of the Court, it is

ORDERED, ADJUDGED and DECREED that the motions by the defendants to dismiss are denied; that the North Carolina State Board of Elections, the Durham County Board of Elections, the Person County Board of Elections, and the Orange County Board of Elections be, and the same hereby are, restrained and enjoined from enforcing the provisions of the January 15, 1968, Rotation Agreement entered into by the three defendant County Boards of Elections until such time as the defendants submit the Rotation Agreement and pursue to successful completion the procedures set forth in § 5 of the Voting Rights Act of 1965 (P.L. 89–110, § 5, August 6, 1965, 79 Stat. 439; 42 U.S.C.

2. Whether or not submission of the Rotation Agreement under § 5 would be necessary if those residents were entitled to vote is a question not reached by this Court.

§ 1973c). If the defendants should choose to submit the Rotation Agreement to the Attorney General of the United States, as provided for in § 5, this submission shall be made in an unambiguous and recordable manner.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that for the reasons set forth in the Opinion of the Court, the enforcement of this injunction shall be stayed until November 4, 1970.