Peter H. BEER et al., Plaintiffs,

v.

UNITED STATES of America et al.,
Defendants,

and

Johnny Jackson, Jr., et al., Intervenors.

Civ. A. No. 1495–73.

United States District Court,
District of Columbia.

Jan. 4, 1974.

James R. Stoner, James R. Treese, Stoner, Treese & Ruffner, Washington, D. C., Blake G. Arata, City Atty., and Ernest L. Salatich, Asst. City Atty., New Orleans, La., for plaintiffs.

M. Karl Shurtliff, Walter Gorman, and Nathaniel Friends, Attys., Dept. of Justice, for defendants.

Stanley A. Halpin, Jr., Kidd, Katz & Halpin, Charles E. Cotton, Cotton, Jones & Fazande, New Orleans, La., Charles E. Williams, III, Jack Greenberg, James M. Nabrit, III, and Eric Schnapper, New York City, and Wiley A. Branton, Washington, D. C., for intervenors.

Arthur F. Matthews, John H. Korns, and Wilmer, Cutler & Pickering, Washington, D. C., for petitioners amici curiae.

Before ROBINSON, Circuit Judge, and CORCORAN and WADDY, District Judges.

PER CURIAM:

Seven non-incumbent candidates for office on the City Council of New Orleans, Louisiana, petition this court as amici curiae to expedite proceedings in this case and set a timetable for councilmanic elections.[1] We are unable to fathom a need to act on the request for expedition since the case already has all the acceleration possible.[2] Nor can we entertain petitioners' request for a scheduling of elections because we have no jurisdiction to award relief of that character in this litigation.[3] For these reasons, which we elaborate below, we dismiss the petition.

I

That the petition may be viewed in proper perspective, our starting point is a brief sketch of the chronology of relevant events. On March 2, 1972, the Council of the City of New Orleans, in attempted response to direction of the city charter, adopted a plan proposing alteration of some of the boundaries of councilmanic districts.[4] On November 15 following, pursuant to Section 5 of the Voting Rights Act of 1965,[5] the plan

---

1. Petitioners do not ask leave to intervene, nor do they seek any other relief. Our disposition of the petition on the merits renders unnecessary any discussion of procedural considerations.

2. See Part I, *infra*.

3. See Part II, *infra*.

4. The Council is composed of two members elected from the city at large and five members elected from councilmanic districts. New Orleans, La., Charter art. III, § 3–102 (1954). The Council is required to reconstitute the five districts as approximately equally populated elective units after each national decennial census. *Id.* art. III, § 3–103(3).

5. Pub.L. 89–110 § 5, 79 Stat. 439 (1965), as amended, 42 U.S.C. § 1973c (1970). Section 5 as codified, provides:

    Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prequisite to voting, or standard, prac-

was submitted to the Attorney General of the United States. On January 15, 1973, the Attorney General interposed an objection to the plan, and that, in consequence of Section 5, rendered unenforceable the redistricting for which it provided unless and until it won approval by this court in accordance with the standard prescribed by that section.[6] On May 3, the Council amended the plan and on May 10 resubmitted it to the Attorney General who, on July 9, again objected. Thus, at least for the time being, councilmanic elections conducted on the basis of redistricting in New Orleans were barred.

On July 25, six members of the Council instituted this action under Section 5 for a judgment declaring that the boundary changes envisioned in the later plan have neither the purpose nor the effect of denying or abridging the right

to vote on account of race or color.[7] This three-judge court, made necessary by Section 5,[8] was designated on July 30. On August 1 the court granted plaintiffs' motion to advance the case for hearing on the merits and set the hearing for August 9.[9] On that date the hearing got under way.

In accordance with the time estimates of counsel for the parties,[10] we blocked out two days for the hearing. As the second day—August 10—drew to an end, however, it became evident that the estimates were woefully low, and that the parties needed better opportunities for development and presentation of their evidence.[11] The hearing was then continued until October 17, the earliest date the court could reconvene for purposes of resuming the hearing; and in the meantime the litigants, at our urging, deposed a number of witnesses and com-

---

tice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the Attorney General's failure

to object nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.

6. See note 5, *supra*.

7. See note 5, *supra*.

8. See note 5, *supra*.

9. To assist the early hearing date and promote expedition in the hearing, we pretermitted the pleading period and proceeded on pretrial statements of legal positions which allowed the parties to submit as late as noon on August 8.

10. At the opening of the hearing, we permitted intervention by five citizens of New Orleans who were registered to vote in councilmanic elections. Compare City of Petersburg v. United States, 354 F.Supp. 1021, 1024 (D.D.C. (1972)), aff'd sub nom., Diamond v. United States, 412 U.S. 934, 93 S. Ct. 2780, 37 L.Ed.2d 393 (1973). See note 16, *infra*.

11. Undoubtedly, the lack of any real opportunity for pretrial discovery was a major factor in counsels' time miscalculations and in the relatively slow pace of the evidentiary presentations on the first two days of the hearing.

pleted a good deal of additional discovery.[12] The benefits of these interim activities, concretized in a broad range of evidence admitted by stipulation,[13] redounded greatly to progress on resumption of the hearing and enabled its conclusion in two additional days. At the close of the hearing, we established a briefing schedule, shortened as much as due regard for the needs stated by counsel could tolerate.[14] So it was that, when on November 20 petitioners came into court to urge expedition, the evidentiary submissions had been completed and the court awaited the parties' briefs.[15]

We recognize fully the great importance to the citizens of New Orleans of regular, orderly elections of the members of the City Council. We have endeavored to respond to the situation with all the speed the judicial process can indulge, and that we will continue to do. We may add that counsel for the litigants have exhibited the same high degree of sensitivity to the problem of time, and have cooperated commendably in the effort to expedite the process. Briefing on the merits was completed a few days ago, and we have set January 16 as the date for oral arguments and submission of the case for determination. Our decision will be forthcoming as soon as the exigencies of judicial deliberation can be met.[16]

## II

Consideration of petitioners' request for specification of a timetable for councilmanic elections in New Orleans necessitates close examination of the jurisdictional allocations which Congress has ordained for controversies respecting Section 5. A private litigant may bring an

12. During this period, the parties took depositions of eleven witnesses. These, by agreement were introduced, in lieu of live testimony by the deponents, when the hearing resumed. Beyond that, a considerable quantity of documentary evidence was assembled, and later admitted by stipulation.

13. See note 12, *supra.*

14. The briefing period totaled a maximum of 55 days, running from the date of availability of the full hearing transcript, which was supplied on an expedited basis within a few days after conclusion of hearing. This may be contrasted with the 84-day period normally allowed for briefing of issues on appeal, a great many of which bear much less importance than those presented here. See Fed.R.App.P. 31(a). As matters worked out, the briefing period in the case at bar closed on December 24.

15. Upon expiration of the time for replies to petitioners' motion for leave to file, we ordered their petition filed and the litigants to respond thereto on the merits within the ten-day period provided by the court's rules. All parties have filed responses.

16. Petitioners, in their November 20 filing, suggested that we render our final decision by either December 19, 1973, or January 16, 1974, and then set primary and general election dates for the selection of city councilmen in New Orleans. Petition of Amici Curiae at 9, 13. As the petition itself states, "[t]he dates suggested . . .

for the final judgment and announcement of election schedule are based on the assumption that the Court upholds the legality of the . . . [re]districting plan" under scrutiny. *Id.* at 9 n. 6. Even assuming that petitioners' timetable was otherwise realistic, it obviously did not take account of the possibility that review of this court's decision might be sought.

Moreover, in the District Court for the Eastern District of Louisiana there is another significant action, brought by the intervenors herein. Jackson v. Council of City of New Orleans, Civ. No. 73–1862 (1973). That action seeks appointment of a special master to devise a plan of redistricting for councilmanic elections in New Orleans, and proceedings therein have been held in abeyance pending decision in the case at bar. Petitioners admit that if this court "were not to approve the . . . plan [before it], different considerations [as to an elections timetable] would apply because of [*Jackson*] and the possibility of a judicial reapportionment of the councilmanic districts." Petition of Amici Curiae at 9 n. 6. The federal defendants herein assert that "[r]egardless of the decision of this Court issues raised in Jackson . . . will survive resolution of the issues here and will have to be litigated before the councilmanic redistricting of the City is finally resolved and elections can be scheduled." Response of United States to Petition of Amici Curiae at 2. We, of course, intimate no opinion on these matters.

action in a local district court [17] for a declaratory judgment as to whether a new state suffrage requirement is subject to approval under Section 5, and for judicial enforcement of the prohibition of that section in the event that it is found to be applicable.[18] In such an action, however, "[t]he only issue is whether a particular state enactment is subject to the provisions of the Voting Rights Act, and therefore must be submitted for approval before enforcement." [19] And the local court must limit its investigation to whether the "state requirement is covered by § 5, but has not been subject to the required federal scrutiny." [20]

As the Supreme Court has counseled, "[i]t is important to distinguish [such] cases from those brought by a State seeking a declaratory judgment that its new voting laws do not have a discriminatory purpose or effect." [21] For "Congress intended to treat 'coverage' questions differently from 'substantive discrimination' questions," [22] and "in the latter type of cases"—the type we have here—"the substantive questions necessary for approval (i. e., discriminatory purpose or effect) are litigated. . . ." [23] "A declaratory judgment brought by the State pursuant to § 5 requires an adjudication that a new enactment does not have the purpose or effect

of racial discrimination" [24] while "a declaratory judgment action brought by a private litigant does not require the Court to reach this difficult substantive issue." [25] So, "what Congress expressly reserved for consideration by the District Court for the District of Columbia or the Attorney General [is] the determination whether a covered change does or does not have the purpose or effect 'of denying or abridging the right to vote on account of race or color.' " [26]

Both the frame and the explicit language of Section 5 clearly confine the authority of this Court to resolution of that single question. A state or political subdivision intercepted by Section 5 is afforded both administrative and judicial recourse in attempts to free its voting changes for operation. It may submit the change to the Attorney General and if no timely objection is interposed it may proceed to put the change into effect.[27] It may, on the other hand— with or without prior submission to the Attorney General—bring suit in this court "for a declaratory judgment that such [change] does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color. . . ." [28] It is noteworthy that neither the Attorney General's failure to object nor the court's declaration favoring the change

---

17. Pursuant to 28 U.S.C. § 1343(4) (1970). See Allen v. State Bd. of Elections, 393 U.S. 544, 554–560, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).

18. Allen v. State Bd. of Elections, *supra* note 17, 393 U.S. at 554–560, 89 S.Ct. 817. See also Perkins v. Matthews, 400 U.S. 379, 383–386, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971).

19. Allen v. State Bd. of Elections, *supra* note 17, 393 U.S. at 558–559, 89 S.Ct. at 828; Perkins v. Matthews, *supra* note 18, 400 U.S. at 383, 91 S.Ct. 431.

20. Allen v. State Bd. of Elections, *supra* note 17, 393 U.S. at 561, 89 S.Ct. at 829; Perkins v. Matthews, *supra* note 18, 400 U.S. at 383, 91 S.Ct. 431.

21. Allen v. State Bd. of Elections, *supra* note 17, 393 U.S. at 555 n. 19, 89 S.Ct. at 826; Perkins v. Matthews, *supra* note 18, 400 U.

S. at 383, 91 S.Ct. 431. A case of that type can be brought only in this court. See note 5, *supra*.

22. Allen v. State Bd. of Elections, *supra* note 17, 393 U.S. at 559, 89 S.Ct. at 828; Perkins v. Matthews, *supra* note 18, 400 U.S. at 385, 91 S.Ct. 431.

23. Allen v. State Bd. of Elections, *supra* note 17, 393 U.S. at 555–556, n.19, 89 S.Ct. at 826; Perkins v. Matthews, *supra* note 18, 400 U.S. at 383–384, 91 S.Ct. 431.

24. Allen v. State Bd. of Elections, *supra* note 17, 393 U.S. at 558, 89 S.Ct. at 828 (emphasis in original).

25. *Id.* (emphasis in original).

26. Perkins v. Matthews, *supra* note 18, 400 U.S. at 385, 91 S.Ct. at 435.

27. See note 5, *supra*.

28. See note 5, *supra*.

bars a subsequent action to enjoin its enforcement.[29]

Judicial activity under Section 5 thus emerges as simply an alternative to the administrative process. By Section 5, as we read it, administrative and judicial functions alike are restricted to approval or disapproval of the changed voting requirement in question. The task which Section 5 assigns to this court is an inquiry focusing exclusively on the existence or nonexistence of racial discrimination resultant from the change. Specifically, the court must weigh the evidence, and must find and declare either that the plan does or that it does not have the purpose or potential effect of diminishing the right to vote because of race or color.

That is the sole function which Section 5 in terms commits to us. We conclude that our probe cannot properly extend to tangential issues—though important issues—which Congress felt could best be handled in local district courts.[30] Congress designated this court as the exclusive forum wherein a state or political subdivision might seek federal approbation of a proposed voting change through a declaratory judgment on the substantive question of discriminatory or nondiscriminatory aim or impact of the change. Nothing in the text or legislative history of Section 5 indicates congressional contemplation that the court was to become involved in the intricacies of local political redistricting, or was to take over the traditional responsibility of a local court to resolve questions more conveniently litigable before its bench.[31]

No question of coverage arises in the context of the case at bar. The City Council of New Orleans realizes that a plan of redistricting for councilmanic elections constitutes a change in voting procedures within the meaning of Section 5 and must have federal approval before it can go into operation.[32] Thus the substantive issue of validity of the new procedures—the new boundaries for councilmanic districts—is squarely before us for adjudication. Section 5, we reiterate, erects a barrier to use of the redistricting plan in connection with any councilmanic election until the plan has been approved by the Attorney General or validated by this court. The Attorney General has disapproved the New Orleans plan, and we have yet to vindicate it.

█ It seems to be the view of petitioners that, as alleged in their petition, our injunction of August 14 "postponed indefinitely any election for city councilmen."[33] We point out, once again, that when the Attorney General registered his objection to the Council's current redistricting plan, Section 5 itself enjoined any election utilizing the new district boundaries specified in the plan.[34] Our injunction, framed and entered at plaintiffs' request without opposition by other litigants, merely spelled out the statutory prohibition against councilmanic elections under the plan. Our order imposed no restriction upon the election of councilmen in the City of New Orleans beyond observance of the statutory mandate. In sum, we followed precedent in a straightforward declaration, for the benefit of all concerned, of the operative effect of Section 5, and did no more.[35]

We conclude, then, that a grant of petitioners' request for expedition is unnecessary, and that a scheduling of a timetable for councilmanic elections in

29. See note 5, *supra*.

30. See City of Petersburg v. United States, *supra* note 10, 354 F.Supp. at 1029.

31. See Allen v. State Bd. of Elections, *supra* note 17, 393 U.S. at 558–560, 89 S.Ct. 817.

32. Perkins v. Matthews, *supra* note 18, 400 U.S. at 387–390, 91 S.Ct. 431; Allen v. State Bd. of Elections, *supra* note 17, 393 U.S. at 569, 89 S.Ct. 817; City of Petersburg v. United States, *supra* note 10.

33. Petition of Amici Curiae at 3.

34. See note 5, *supra*.

35. See City of Petersburg v. United States, *supra* note 10, 354 F.Supp. at 1023–1024.

the City of New Orleans is beyond our jurisdiction. We accordingly dismiss the petition without prejudice to a refiling in another forum of so much of it as may be appropriate for litigation therein.