Elsie Faye HEGGINS, J. B. Jackson, Lovie Lipscomb, Shirley Harvey, Lola Brown, J. R. Brown and Mary J. Body

v.

CITY OF DALLAS, TEXAS, Robert Folsom, Mayor, George Schrader, City Manager and Robert Sloan, City Secretary of the City of Dallas.

Civ. A. No. CA 3–79–118–E.

United States District Court,
N. D. Texas,
Dallas Division.

Memorandum Opinion and Order Feb. 20, 1979.

Memorandum Opinion Feb. 22, 1979.

Elizabeth K. Julian, Dallas Legal Services Foundation, Inc., James A. Johnston, Johnston & Larson, Edward B. Cloutman, III, Mullinax, Wells, Baab, Cloutman & Chapman, Dallas, Tex., for plaintiffs.

Joseph G. Werner, Asst. City Atty., Dallas, Tex., for defendants.

Before GOLDBERG, Circuit Judge, and MAHON and HILL, District Judges.

MEMORANDUM OPINION AND ORDER

Plaintiffs bring this action for injunction under the Voting Rights Act of 1965.[1]  A

1.  42 U.S.C. § 1973 *et seq.*

three-judge court was convened, and a hearing was held February 16, 1979. After carefully considering the evidence and the arguments of counsel, the Court has determined that the City of Dallas may not conduct city council elections until the city's election plan has received the preclearance required by section 5 of the Voting Rights Act of 1965.[2]

## I.

■ The Court has jurisdiction over the subject and the parties in this lawsuit, and venue is proper in the Northern District of Texas. 42 U.S.C. §§ 1973c and 1973j; *Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1968).

The Supreme Court decisions clearly define our scope of review in this lawsuit. We may determine only whether the Dallas election plan is subject to the preclearance requirement of the Voting Rights Act.

*Perkins v. Matthews,* 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1970); *Allen v. State Board of Elections, supra.* Our inquiry does not extend to the question of compliance with the other requisites of the Voting Rights Act; those issues are reserved to the Attorney General of the United States or the district court for the District of Columbia. 42 U.S.C. § 1973c; *Perkins v. Matthews, supra.*

## II.

■ The eight/three election plan at issue was adopted as the result of the district court opinion in *Lipscomb v. Wise,* which held the city's prior election plan unconstitutional.[3] After the Supreme Court remanded *Lipscomb,* the city filed suit in the United States District Court for the District of Columbia requesting a declaration that the eight/three plan complies with the Vot-

---

**2.** 42 U.S.C. § 1973c provides:

[W]henever a [covered] State or political subdivision . . . shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), of this title and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: Provided, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered un-

der this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 of the United States Code and any appeal shall lie to the Supreme Court.

**3.** 399 F.Supp. 782 (N.D.Tex.1975), *rev'd,* 551 F.2d 1043 (5th Cir. 1977), *rev'd and remanded to court of appeals,* 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978), *remanded to district court,* 583 F.2d 212 (5th Cir. 1978). In *Lipscomb v. Wise,* the Supreme Court determined that the city's eight/three plan is a legislative plan and remanded the case for consideration of the effect of the Voting Rights Act which had been made applicable to Texas while the appeal was pending. The court of appeals remanded *Lipscomb* to the district court stating that the parties had "consented to the entry of an order to the effect that section 5 of the Voting Rights Act did apply to the legislative enactments of the City of Dallas . . . .." *Lipscomb v. Wise,* 583 F.2d 212 (5th Cir. 1978).

ing Rights Act.[4] The United States has answered the city's allegations in that court, and groups of black and Mexican-American Dallas voters have intervened. The District of Columbia court has not yet ruled and has not set the case for trial.

Section 5 of the Voting Rights Act of 1965 prohibits a State or political subdivision subject to section 4 of the Act from implementing a new election plan unless it has obtained a declaratory judgment from the District Court for the District of Columbia, or a ruling from the Attorney General of the United States, that the election plan "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color . . . ." 42 U.S.C. § 1973c; *United Jewish Organizations v. Carey,* 430 U.S. 144, 147, 97 S.Ct. 996, 51 L.Ed.2d 229 (1976); *accord, Dougherty County, Georgia, Board of Education v. White,* ──── U.S. ────, 99 S.Ct. 368, 371, 58 L.Ed.2d 269 (1978). Section 4 of the Act makes section 5 applicable to Texas and the City of Dallas. 42 U.S.C. § 1973b; 40 Fed.Reg. 43746 (1975); *Briscoe v. Bell,* 432 U.S. 404, 97 S.Ct. 2428, 53 L.Ed.2d 439 (1976).

Plaintiffs contend that the city cannot lawfully conduct any city council elections until the District of Columbia court preclears the entire plan. The city concedes that it cannot hold elections for the eight single-member places without section 5 preclearance. It contends, however, that no preclearance is necessary for the three at-large places, and that it may, therefore, proceed to hold elections for those three seats. Prior to the decision in *Lipscomb v. Wise,* Dallas elected all of its eleven council members to at-large places. The city contends that the current at-large places are unchanged from three at-large places that were in effect before *Lipscomb v. Wise* and before November 1, 1972, and that, therefore, these three places are not subject to the Voting Rights Act.[5]

We are unable to agree with the city's contention. Section 5 of the Voting Rights

Act requires the city to obtain preclearance whenever it seeks "to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972, . . . ." 42 U.S.C. § 1973c. The Supreme Court has consistently held that this language from the Act is to be given the broadest possible scope. *Perkins v. Matthews, supra; Allen v. State Board of Elections, supra.* Even changes seemingly as minor as moving a polling place are to be covered by the Act. Agreement with the city would require that we give section 5 less than its broadest possible scope, and this we decline to do.

Rather than viewing its election plan as an entity and comparing the entire election plan in effect in 1972 with the entire eight/three plan under scrutiny here, the city argues for an analysis that bifurcates the examination. It would have us test the at-large places apart from the remainder of the election plans. Because the constituency for each at-large place remains constant in both plans, the city contends that there has not occurred the sort of change contemplated by the Act.

We have concluded that the city's analysis takes too narrow a view of the problem. Although the constituencies for the at-large places have remained constant, the influence on an election of the votes cast by each Dallas voter has been altered drastically. Under the prior plan, each voter cast eleven votes and participated in electing all eleven council members; under the current plan, each voter is allowed to participate in the election of only four council members. Changes like this are the kind that the Supreme Court and Congress intended to come within the coverage of the Act.

The eight/three plan has been treated as a single unit throughout most of its existence, and only recently has the city attempted to bifurcate the plan. In *Lipscomb v. Wise,* the district court held the *entire* eleven seat plan to be unconstitutional;

4. *City of Dallas v. United States,* No. CA 78–1666 (D.D.C., filed Sept. 5, 1978).

5. 42 U.S.C. § 1973c, *supra* footnote 4.

places 9, 10, and 11 were never treated apart from the other eight at-large places. The city then proposed and ultimately adopted the *entire* eight/three plan; again no attempt was made at bifurcation.

Accordingly, the Court finds that the eight/three election plan is a voting qualification or prerequisite to voting, or a standard, practice, or procedure with respect to voting different from that in force or in effect on November 1, 1972. The Court finds that the eight/three election plan is subject to the Voting Rights Act, and further finds that the city may not lawfully hold an election pursuant to the eight/three plan until it obtains the preclearance required by section 5 of the Act.

### III.

■ There is confusion in the case law about the precise remedy to be accorded to plaintiffs in a case of this nature. Plaintiffs have requested that we enjoin the city from conducting any election until the city has obtained section 5 preclearance of its election plan. The Supreme Court cases indicate that an injunction against elections pending preclearance is proper. *Allen v. State Board of Elections, supra; Perkins v. Matthews, supra.* Additionally, the lower courts have enjoined elections when they have found an election practice to be covered by the Act. *See Matthews v. Leflore County Board of Election Commissioners,* 450 F.Supp. 765 (N.D.Miss.1978); *Horry County v. United States,* 449 F.Supp. 990 (D.D.C.1978); *White v. Dougherty County Board of Education,* 431 F.Supp. 919 (M.D. Ga.1977), *aff'd,* —— U.S. ——, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978); *Pitts v. Carter,* 380 F.Supp. 4 (N.D.Ga.1974); *Beer v. United States,* 374 F.Supp. 357 (D.D.C.1974). Other courts have either failed to enjoin or refused to enjoin elections despite a finding of coverage under the Act. *See Oden v. Brittain,* 396 U.S. 1210, 90 S.Ct. 4, 24

L.Ed.2d 32 (Black, J., 1969); *United States v. County Commission, Hale County, Alabama,* 425 F.Supp. 433 (S.D.Ala.1976) *judg't aff'd* 430 U.S. 924, 97 S.Ct. 1540, 51 L.Ed.2d 768; *Moore v. Leflore County Board of Election Commissioners,* 351 F.Supp. 848 (N.D.Miss.1971); *Wilson v. North Carolina State Board of Elections,* 317 F.Supp. 1299 (M.D.N.C.1970).

We have examined this apparent division of authority and conclude that the courts which have chosen to not enjoin elections have grounded their decisions in equitable considerations having to do primarily with the timing of the plaintiff's claim. If the plaintiffs in this lawsuit had delayed seeking relief so that an injunction would impose an inequitable burden on the city, the voters, or the candidates, we would not hesitate to refuse to enjoin the election. This, however, is not the case. The plaintiffs filed this action on February 1, 1979, nearly four weeks before the deadline for candidates to file their nominating petitions. The election is scheduled for April 7, 1979. This is clearly not an election-eve lawsuit. Candidates have not yet expended time and money in their campaigns; indeed, it is likely that even at this date many potential candidates have only begun to explore the possibility of running for office.

It seems to us eminently more equitable to all concerned to delay the election rather than to allow an election in direct contravention of the Voting Rights Act. Although the court in *Lipscomb* tested and approved the eight/three plan according to constitutional standards, approval under the Voting Rights Act is an independent matter. We feel certain that the District of Columbia court will proceed with all due speed toward resolution of the claims before it, and pending that resolution, we feel that the status quo should be maintained.[6]

---

**6.** We feel constrained to comment about the precise limits of our decision. We hold only that the city's eight/three plan is subject to the requirements of the Voting Rights Act. We are without jurisdiction to determine whether the city's plan denies or abridges the right to vote in contravention of the Voting Rights Act, and we have purposefully ignored those issues. This decision determines coverage only and is not to be taken as an indication, inferential or otherwise, that the city's plan does not meet the requirements of the Voting Rights Act.

We, therefore, have determined that the city should be enjoined from conducting city council elections until it can do so in compliance with section 5 of the Voting Rights Act. While we recognize that an injunction is a harsh measure to be utilized with care, we are of the opinion that Congress and the Supreme Court intended injunctions against elections to be the normal remedy afforded against defendants who attempt to hold elections before obtaining preclearance. The threat and the pressure of an injunction provides a strong incentive for compliance with the Act. The policy considerations associated with the Act require that injunctive relief be granted unless the record reveals facts which indicate that the injunction would work an inequitable burden upon the city, its voters, or the candidates for election.

## ORDER

In accordance with the above Memorandum Opinion:

1. The City of Dallas is enjoined from holding city council elections until it has obtained preclearance of an election plan from the Attorney General of the United States or of the District Court for the District of Columbia as required by section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c.

2. The injunction specified in number 1 above shall dissolve upon a determination by the Attorney General of the United States or the District Court for the District of Columbia that an election plan of the City of Dallas complies with the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.*

3. The City of Dallas shall forthwith submit places 9, 10, and 11 of its eight/three plan to the Attorney General of the United States *or* to the District Court for the District of Columbia for preclearance pursuant to section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c.

4. The Dallas City Council election scheduled for April 7, 1979, is postponed pending further order of this Court. The February 26, 1979, deadline for the filing of nominating petitions is also postponed pending further order of this Court. All nominating petitions for candidacy in the April 7, 1979, election filed prior to February 26, 1979, shall be preserved by the city pending further order of this Court.

5. The current members of the Dallas City Council shall continue in office, notwithstanding the expiration of their elected terms, until such time as their successors have been lawfully elected. Vacancies in the membership of the council due to death, resignation, or other causes shall be filled in the manner prescribed by law. While serving under this Order the members of the Dallas City Council shall be vested with all the power, authority, and duties accorded by law.

6. This Court shall retain jurisdiction in this matter for the purpose of rescheduling Dallas City Council elections when the city obtains preclearance of its election plan.

It is so ORDERED.

Signed this 20 day of February, 1979.

ROBERT M. HILL, District Judge, dissenting in part.

I concur as to part I and II of the opinion. I dissent as to part III and would deny the injunctive relief sought in this case. A memorandum opinion setting forth my reasons will be forthcoming.

## MEMORANDUM OPINION

ROBERT M. HILL, District Judge.

The following opinion sets forth the reasoning for my dissent from Part III of this court's Memorandum Opinion and Order of February 20, 1979.

The majority apparently concedes, as it must, that § 5 of the Voting Rights Act of 1965, ("the Act") 42 U.S.C. § 1973c, does not mandate the injunctive relief sought by plaintiffs. *See Berry v. Doles,* 438 U.S. 190, 98 S.Ct. 2692, 57 L.Ed.2d 693 (1978). It determines, however, that § 5 of the Act contemplates as the "normal remedy" enjoining elections which have not been precleared in accordance with the Act. The

majority would depart from the "normal remedy" only if the plaintiff should bring an election eve lawsuit. Because I feel that the majority has applied improper criteria in determining whether to enjoin the Dallas City Council election scheduled for April 7, 1979, and believe that consideration for the proper criteria requires that the election not be enjoined, I dissent.

Before discussing the applicable law, I wish to develop certain facts not emphasized in the memorandum opinion of February 20, 1979, which I believe are highly relevant to the issue of a proper remedy in this case. The city's current election plan was adjudged constitutional in *Lipscomb v. Wise*, 399 F.Supp. 782 (N.D.Tex.1975). The Fifth Circuit upheld the constitutionality of the plan, but reversed on the ground that the plan did not comply with strict standards required of a judicial plan. 551 F.2d 1043. The United States Supreme Court reversed, holding that the plan was "legislative" rather than "judicial," but did not disturb the holding that the plan was constitutional, 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978). The city held an election under the plan in April of 1975, after the federal district court had declared it to be constitutional. Thereafter, on September 23, 1975, § 5 of the Voting Rights Act became applicable to the State of Texas. 40 Fed.Reg. 43746. In April of 1977, the current members of the city council were elected under the plan, which had not been precleared in accordance with § 5 of the Act. The United States Supreme Court, in *Wise v. Lipscomb*, 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed. 411 (1978), noted that Texas had become subject to § 5 of the Act while the case was pending on appeal and remanded to the Fifth Circuit for consideration of the impact of the Act on the plan. The city pretermitted the Fifth Circuit's task on remand by stipulating to the applicability of § 5 of the Act to legislative enactments of the city. On September 5, 1978, the city brought a declaratory action against the United States in federal district court in the District of Columbia seeking preclearance of the eight single-member districts provided for in the plan. The

Fifth Circuit entered an order on November 6, 1978, remanding to the district court for further proceedings.

Black and Mexican-American voters of the city have been permitted to intervene in the declaratory judgment action pending in the federal district court for the District of Columbia. That court recently granted the United States' request for one month's additional time in which to conduct discovery.

The filing deadline for the city's April 7 election of city council members is February 26. There is nothing in the record to support the majority's finding that candidates have not yet expended time and money in their campaigns. To the contrary, it is reasonable to presume that candidates have already spent time and money preparing for the upcoming election.

Under the plan, council members are elected "for a term of two (2) years." "The council members so elected shall take office on the first Monday in May succeeding the election, and they shall serve until their respective successor shall have been elected and shall have qualified." City Charter of the City of Dallas, Chapter III, § 1. The plan further provides:

> (a) If more than four (4) vacancies occur on the city council at any one time or if a vacancy occurs on the city council on or before the seventh day of February of an even-numbered year, the vacancy or vacancies shall be filled at a special election for that purpose. At its next regular meeting after the occurrence of the vacancy or vacancies, the city council shall call a special election to be held not less than forty (40) days nor more than sixty (60) days after the date of the call.

> (b) If vacancies on the city council do not exceed four (4) and a vacancy occurs subsequent to the seventh day of February of an even-numbered year the vacancy shall be filled by a majority vote of the remaining members of the council.

City Charter of the City of Dallas, Chapter III, § 5.

In sum, the city has a constitutional election plan under which council members

were lawfully elected in 1975. In 1977, council members were elected under the plan in violation of § 5 of the Act, and in 1979, the city seeks again to hold an election under the plan.

The majority attempts to read into the Act a strong preference where the courts have failed to read a mandate that no election should be held if an approved election may not be held. While the Act has been said to impose "restrictions unique in the history of our country," *Berry v. Doles, supra,* 438 U.S. at 200, 98 S.Ct. at 2698, 57 L.Ed.2d at 701 (Powell, J. concurring) it has not been interpreted to require the frustration of the electoral processes in all circumstances where an election plan has not obtained preclearance. *See Berry v. Doles, supra; Perkins v. Matthews,* 400 U.S. 379, 396–97, 91 S.Ct. 431, 27 L.Ed.2d 476 (1970). Justice Powell has called for the need to bring a measure of common sense to the application of the Act. *Berry v. Doles,* 438 U.S. at 199, 98 S.Ct. at 2697, 57 L.Ed.2d at 701. Changes in election laws are submitted for approval to the Attorney General at the rate of over 1000 per year. *Id.* Even a cursory examination of *Beer v. United States,* 374 F.Supp. 357 (D.D.C.1974) shows that the majority's hope for a quick disposition of the city's suit seeking approval of the plan is illusory. *Beer, supra,* was filed by council members of the City of New Orleans on July 25, 1973, and the court, having accelerated the case as far as possible, did not issue an opinion on the merits until May 15, 1974. The City of Dallas' suit, which seeks approval of the election plan of the seventh largest city of the country, already has shown signs of becoming protracted litigation. Meanwhile, the voters of the city are disenfranchised and city government operates under a cloud, if it operates at all. I do not believe Congress intended this to be the normal result.

The courts have endeavored when possible to fashion remedies under the Act that permit elections to go forward at the scheduled time. *See, e. g., Pitts v. Carter,* 380 F.Supp. 4, 8 (N.D.Ga.1974) (three-judge court directing single judge to devise plan for conduct of upcoming election). While the very plan before us was under consideration by the Supreme Court, the Court expressed that, pending the submission and clearance of a plan under the Act, "if a State's electoral processes are not to be completely frustrated, federal courts will at times necessarily be drawn further into the reapportionment process and required to devise and implement their own plans." *Wise v. Lipscomb,* 437 U.S. 535, 98 S.Ct. 2493, 2498, 57 L.Ed.2d 411, 419 (1978). At the very least, this court should have devised a plan so that April 7 election could be held.

Even though courts have, for lack of time or other reasons, declined to devise interim plans for upcoming elections, most have refused to enjoin such elections. *E. g., United States v. County Comm'n, Hale Cty., Ala.,* 425 F.Supp. 433 (S.D.Ala.1976), *judg't aff'd,* 430 U.S. 924, 97 S.Ct. 1540, 51 L.Ed.2d 768 (1977); *Moore v. Leflore Cty. Bd. of Election Comm'rs,* 351 F.Supp. 848 (N.D. Miss.1971); *Wilson v. North Carolina St. Bd. of Elections,* 317 F.Supp. 1299 (M.D.N. C.1970). *See also Georgia v. United States,* 411 U.S. 526, 541, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973). In *Hale County, supra,* the circumstances militated much more in favor of an injunction against an upcoming election than they do in the present case. In that case, Hale County had changed from a single-member to an at-large plan for electing commissioners and had conducted several elections under the plan before suit was filed to enjoin an upcoming election. Even though the court could have ordered an election under the former single member plan, it permitted the election to be held as scheduled under the at-large plan. Since the Supreme Court summarily affirmed *Hale County,* the majority apparently seeks to distinguish the case on the basis of the timing of the plaintiff's claim. Where the majority discovered the file date of *Hale County* on which to base its "timing" distinction I have no idea because it is not mentioned in the three-judge court's opinion or in the Supreme Court's summary affirmance. A reading of the cases reveals

that enjoining an election for an indefinite time until preclearance is obtained is the exceptional remedy rather than the normal one. *See City of Richmond, Va. v. United States*, 376 F.Supp. 1344, 1351 & n. 39 (D.D. C.1974); *Beer, supra.*

The Supreme Court considered the issue of appropriate remedies for violations of § 5 of the Act in *Perkins, supra.* The *Perkins* court declined to order a new election to displace representatives elected under an unapproved plan and remanded to the district court to fashion an appropriate remedy in light of the circumstances of the case and the "nuances of the local situation." 400 U.S. at 396–97, 91 S.Ct. 431. The Court recently declined a like invitation in *Berry v. Doles, supra.* This case calls for even closer scrutiny of the circumstances than *Perkins* and *Doles*, because plaintiffs seek to deprive the voters of the city of the right to vote for representatives in city government for an indefinite time. In *Perkins* and *Doles*, voters had exercised their right to vote and the burden of a new election under a court ordered plan would fall upon the city government and the candidates rather than upon the voters. Since the Act is ultimately concerned with protection of the right to vote, a court should be even more cautious when asked to postpone indefinitely an election than when asked to order a new election.

I recognize that in *Holt v. Richmond*, 406 U.S. 903, 92 S.Ct. 1602, 31 L.Ed.2d 814 (1972), three justices of the Supreme Court granted an application to enjoin upcoming city elections under an unapproved plan, even though the incumbents had been illegally elected under the plan. The justices, however, did not consider the discussion of an appropriate remedy in *Perkins, supra.* Furthermore, a federal district court for the District of Columbia, in denying approval of the plan, remarked that the illegally elected incumbents had continued in office for four years because city elections had been enjoined until that court's decision, and that, therefore, the incumbents had evaded the intended "freezing effect" of § 5 of the Act. *City of Richmond, Va., supra*, 376 F.Supp. at 1358. Finally, the full Court later af-

firmed *Hale County*, which cannot be read consistently with *Holt, supra.*

The Supreme Court has not delineated the circumstances which are important in fashioning a remedy under the Act. Since the majority has chosen to rely upon the presumption that an election under an unapproved plan should be enjoined rather than to examine the circumstances of this case, I now undertake to determine what circumstances a court should take into account in fashioning a remedy under the Act.

I begin with the proposition that a court should enjoin an election under the Act only if to do so would effectuate the purposes of the Act. The Act seeks to prevent political subdivisions from enacting and enforcing new laws which might have a racially discriminatory purpose or effect with regard to voting. *Perkins, supra*, 400 U.S. 395–96, 91 S.Ct. 431. The mechanics of the Act constrain a political subdivision to police itself by seeking approval of any changes in its election laws from the Attorney General or a federal district court in the District of Columbia. *Id.* Congress passed the Act in response to evidence that states and subdivisions had circumvented declarations that their election laws were unconstitutional by enacting new unconstitutional laws and enforcing them while their constitutionality was being adjudicated anew.

In light of these purposes, a court should first take into consideration in determining a remedy under the Act the potential which the changed law has for prejudicing the voting rights of racial minorities. *See Moore v. Leflore Cty., supra*, 351 F.Supp. at 852. Thus, the Court suggested that the "nature of the changes complained of" may be considered in determining an appropriate remedy. *Perkins, supra*, 400 U.S. at 396, 91 S.Ct. at 441. Second, a court should consider whether a political subdivision has unduly delayed in seeking approval of changes in its election laws. Accordingly, the Supreme Court expressed that the reasonableness of predicting coverage under § 5 of the Act is a factor to be considered in fashion-

ing a remedy. *Id.* Third, a court should determine whether a political subdivision has evaded constitutional review of its election procedures by changing them.

The consideration deemed crucial by the majority—the timing of plaintiff's suit—has nothing to do with the purposes of the Act. If timing emerges from the decisions as a factor, it does so only as a consequence of the efforts of courts to avoid enjoining elections. *See* discussion, *supra.* Enjoining an election on its eve rather than earlier may impose a heavier burden on the candidates, who will have more spent time and money on their campaigns, and on the political subdivision, which will have expended greater efforts in preparing for the election. It does not impose a heavier burden on the voters, whose interest the Act seeks to protect, because they suffer equally regardless of when the election is enjoined.

Furthermore, even if the timing of plaintiff's suit is a relevant factor, the facts do not support the majority's conclusion that plaintiffs did not unduly delay in bringing this suit. Plaintiffs could have filed this suit at any time after September 23, 1975. Instead they chose to file it on February 1, 1979, 25 days before the filing deadline for the April 7 election.

I turn now to the propriety of enjoining the scheduled election in light of the relevant circumstances. I do not perceive how permitting the April 7 election to go forward as scheduled will prejudice the voting rights of racial minorities. Enjoining the upcoming city election merely prolongs the terms of council members elected under the same plan which the city proposes to utilize in the upcoming election. The election will merely change the faces on the city council; it alone will not prejudice black voters. The injunction issued by the majority has the sole practical effect of putting the responsibility for new faces on the council in the hands of the city council, who will appoint replacements for members who choose to resign rather than hold over, and taking it out of the hands of the electorate. The city did not enact the plan to evade constitutional review, but rather, formulated it to

pass constitutional muster. The plan's constitutionality has been affirmed by the Fifth Circuit, a holding left undisturbed by the Supreme Court. Finally, the city has not unduly delayed in seeking preclearance of the plan. It cannot be faulted for not seeking preclearance while the plan's constitutionality was being reviewed by the Fifth Circuit and after it had been declared illegal by the circuit court. After the Supreme Court reversed the Fifth Circuit and remanded *Wise v. Lipscomb, supra,* for consideration of the impact of § 5 of the Act on the plan, the city acted with commendable speed in seeking approval of the plan. Without awaiting the decision of the Fifth Circuit on remand, where it stipulated that § 5 of the Act applied to the city's enactments, it filed suit in federal district court in the District of Columbia for a declaration of the plan's legality, bypassing submission to the Attorney General.

All the relevant considerations lead to the conclusion that this court should not enjoin the April 7 election. By enjoining the election, this court not only disenfranchises the voters of Dallas but it does untold damage to the city's government. The acts of city council members whose two year terms will expire on May 7 will arguably have no legal effect. More importantly, the city's charter provides for a special election if more than four council members resign at any one time. Under the court's Order, vacancies are to be filled in the manner prescribed by law. Of course any election under the current plan is prohibited. Thus, if the city council resigns *en masse*, the city would have no government until the court could devise a plan for the holding of special elections. Since the court has retained jurisdiction only for the purpose of rescheduling elections when the city obtains preclearance of its election plan, it may not even have power to devise an interim plan.

I would not enjoin the April 7 election conditional upon the city amending its complaint in the District of Columbia suit to seek preclearance of the entire plan. *See Berry v. Doles, supra.* Further, I would retain jurisdiction so that if the city became

dilatory in prosecuting its action seeking preclearance after the April 7 election, the court could devise an interim plan. Alternatively, the court should devise an interim plan under which the April 7 election could be held. The majority feels that indefinitely enjoining the election is the normal remedy required by the Act. Hence, they have blinded themselves to the availability of other remedies and have ignored the circumstances existing in this case which demonstrably weigh in favor of permitting the April 7 election to go forward.